# HAIRSTON v. DANVILLE AND WESTERN RAILWAY COMPANY.

## ERROR TO THE SUPREME COURT OF APPEALS OF THE STATE OF VIRGINIA.

No. 6.    Argued January 10, 13, 1908.—Decided February 24, 1908.

Where the condemnation of land has been held by the state court to be authorized by the constitution and laws of that State this court cannot review that aspect of the decision.

Where the state law, as is the case with the law of Virginia, permits no exercise of the right of eminent domain except for public uses, a general

judgment of condemnation by the state court will be assumed to have been held to be for a public use even if there was no specific finding of that fact.

While it is beyond the legislative power of a State to take, against his will, the property of one and give it to another for a private use, even if compensation be required, it is ultimately a judicial question whether the use is public or private; and, in deciding whether the state court has determined that question within the limits of the Fourteenth Amendment, this court will take into consideration the diversity of local conditions.

While cases may arise in which this court will not follow the decision of the state court, up to the present time it has not condemned as a violation of the Fourteenth Amendment any taking of property upheld by the state court as one for a public use in conformity with its laws.

The use for which property may be required by a railroad company for increased trackage facilities is none the less a public use because the motive which dictates its location is to reach a private industry, or because the proprietors of that industry contribute to the cost; and so held that a condemnation upheld by the highest court of Virginia as being in conformity with the law of that State did not deprive the owner of the property condemned of his property without due process of law.

THIS is a writ of error to the highest court of the State of Virginia. The defendant in error is a corporation created by the State of Virginia and operating a railroad entirely within that State. Its main line runs near the town of Martinsville, and from it a branch line runs into Martinsville and there ends. The railway company began a proceeding in a circuit court of that State for the condemnation of land belonging to Miss Hairston, the plaintiff in error, for the construction of a spur track, which was alleged to be needed for the transaction of its business, for the accommodation of the public generally, and for the purpose of reaching the factory of a large shipper, the Rucker and Witten Tobacco Company. By pleadings duly filed the land owner set up the defense (*inter alia*) that the proposed condemnation was not for a public use, and was therefore contrary to the constitution and laws of Virginia and the Fourteenth Amendment to the Constitution of the United States. Testimony was taken on this issue before the judge of the circuit court, who found against the contention, and appointed commissioners to ascertain the damage caused by the taking. The commissioners ascertained the amount of the damages.

The judge confirmed their report, and ordered that upon payment of the damages a fee simple in the land should be vested in the railway company. The land owner petitioned the Supreme Court of Appeals to grant a writ of error to review the judgment of the circuit court. The petition was denied, and a writ of error transferring the record to this court was allowed.

The uses for which the land sought to be condemned was needed are described in the testimony of the superintendent of the railroad. The material parts of it follow:

"The Danville and Western comes into Martinsville on a branch spur from the main line, running between Danville and Stewart. This spur leaves the main line about very nearly half a mile east of Martinsville. It comes into Martinsville and ends at Franklin street. The Danville and Western has in the town of Martinsville this main line referred to. The main line proper runs parallel with and about three feet from the platform of the freight and passenger station. Parallel to this track there is another track, about fifteen feet between the centers of the two tracks, running parallel with and about four or five feet from the Alliance warehouse. Both of those tracks are spur tracks, and end at Franklin street. The company also has a freight and passenger station and platform, with a portion of the platform shedded. There is also another track, designated Tabernacle track. This track is several hundred feet east of this freight and passenger station referred to, and is parallel with the main line. This track will hold seven box cars, but is quite a heavy grade—about two feet to the hundred feet. There is also parallel with the main line and also parallel with this Tabernacle track a spur track, which is designated spur track. These are all the tracks that the company has in the town of Martinsville, except a track known as Lester's siding. This, however, is a private siding and is fenced in. The gate is, as a rule, locked, and the company can use for its business only about two box car lengths on the outside of the fence. When I took charge of the road as superintendent, on the 10th day of September, 1903, I was very much impressed

with the congested condition of things in Martinsville, the danger of operating the yard, and was especially impressed with the lack of team track room; I mean by that, suitable tracks on which solid cars loaded with freight can be placed, such freight to be unloaded by consignees and teams, or *vice versa;* tracks to place empty cars on, into which shippers could load freight from their teams. I found only space for three box cars—I mean by that, proper and suitable space. That was the portion of the track described as parallel with the platform, and west of the station building, about three car lengths. Being impressed with the danger of operating this yard, soon after taking charge I gave positive instructions that the track designated as Tabernacle track must never be used for storing cars, and must be kept clear and used only to pass trains. The track was built and intended to pass trains—that is, to side-track one train on it and let the other pass. On account of the increase of the business at Martinsville, it has been necessary to change these instructions, and we have been forced to use the Tabernacle track on which to place team track cars, solid cars to be unloaded by consignees. . . . In order to get out of Franklin street I selected a lower route, and employed a competent engineer to lay off and make plans for the most feasible track, to obtain as much team track room as possible, and at the same time to reach the plant of the Rucker & Witten Tobacco Co. I was informed that this plant would be very greatly enlarged, and in fact the entire business of this concern would eventually be consolidated at Martinsville. By adopting the route proposed we would not only reach the plant of the Rucker & Witten Tobacco Co. and thereby secure for the Danville & Western a great increase in business, but we would also greatly enlarge our team track facilities. I mean by that, the portion of the track on which loaded cars would be placed to be unloaded by merchants and others in Martinsville doing business here. The map shows that about 500 feet of this proposed track is level; this would be used entirely for the public. This 500 feet would store about 16 or 18 team track cars, and will

be used entirely to place cars on for the general public. In addition to that we would reach the Rucker & Witten Tobacco Company's plant, and we would thus be enabled to place cars for that concern immediately at the factory doors, thus relieving the short team track we have in the yard, and also doing away entirely with the danger of using this Tabernacle track as a team track. We can also place empty cars at the Rucker & Witten Tobacco Company's plant, in which they can load their tobacco shipments. This will also greatly relieve us at the station. This concern has within the last thirty days made in one shipment 14 solid cars of manufactured tobacco, going to one destination, and all shipped the same day. At present we have team track room for seven cars on this Tabernacle siding, which I have explained, is on a grade of about two feet to the hundred feet, and, therefore, very dangerous to operate and to stand cars on. There is room for three cars west of the station building between the station building and Franklin street, and on this same track there is room for five cars to be placed at the platform. These last five cars, are, as a rule, merchandise cars that come here loaded for various consignees, and are unloaded by the station force into the station building. Unloaded freight is placed by shippers on the platform and is loaded into empty cars standing in the same five-car space. In order to meet the demands of the business, therefore, it is absolutely necessary to obtain more and better terminal facilities here. We wish to get away from the danger of using this Tabernacle track as a team track as early as possible. The track is on a heavy grade and cars are liable to get loose and roll down the grade. In case one of these cars should happen to get loose just as a train was approaching Martinsville a serious accident would result, the grade is so heavy. Consignees sometimes attempt to move cars a little themselves, and are not able to hold them, and they strike the others on the track, and they have invariably been derailed. We have in the last sixty days had several derailments on this track. I will say, on account of the danger, the east end of the track is protected

by a modern safety switch, derailing switch. When the cars strike this switch, they are thrown off the track on the ground. That damages the cars, and damages the track, and causes delay and expense in rerailing them again. To give some idea of the increase of business at Martinsville, I will state that the auditor of the Danville and Western Co. made me a statement for November and December, 1904, as compared to same months last year, outbound or forwarded business in November, 1904.

"Mr. STAPLES: Will you file that report with your deposition?

"The WITNESS: Yes, sir.

"ANSWER (continued). Outbound or forwarded business for November, 1904, as compared with same month 1903, shows an increase of about 16⅔ per cent. The inbound business for November, 1904, compared to same month last year, shows an increase of about 89 per cent. The outbound business for December, 1904, as compared to same month 1903, shows an increase of about 16⅔ per cent, and the inbound business for December, 1904, as compared to same month last year, shows an increase of about 100 per cent. So in order to at all handle the business with safety or convenience to patrons it is absolutely necessary to get more and better terminal facilities. In order to do that, we have located what we think to be the best and most feasible line to accomplish the two objects—get the terminal facilities, and at the same time reach the plant of the Rucker & Witten Tobacco Co.

"Q. Now, Major, will there be access along the line from Fontaine street to the depot of the Danville & Western Ry., in Martinsville, for the purpose of reaching the cars standing upon the track?

"A. These cars will be standing on this proposed track, not at the station, and parties can reach such cars with ease from Fontaine street. It is also proposed to have an entrance on the alley near the Alliance warehouse, near the proposed track.

"Q. Has the city of Martinsville grown very much in size and business within the last year or two?

"A. It has grown very much in business over our line, and I notice there is considerable building.

"Q. Well, in your opinion, is this proposed extension of your track necessary for the public convenience and for enabling the railroad to meet the business demands of the city of Martinsville?

"A. It is, sir. There is another fact of public interest which occurs to me that probably the court would like to know. The manufacturers, or parties who use steam coal, are more conveniently located to the Danville and Western station than to the Norfolk & Western station. The coal, however, comes into Martinsville over the Norfolk & Western. The manufacturers are very anxious to handle this coal on the Danville & Western tracks on account of saving which there would be in drayage and on account of convenience. We have an understanding with the Norfolk & Western traffic people that we will switch this coal to our tracks. It is not practicable now to do this, because we have no track room. It will be practicable if this proposed road is built, and that is the object of the understanding.

"Q. Then this proposed extension will be, or will it not be, for the use of the public and for the reception and delivery of consignments by your railway to the entire public?

"A. It will be for the use of the public in that cars loaded with carload shipments consigned to various consignees in Martinsville will be placed on these tracks to be unloaded, and empty cars will be placed on these tracks to be loaded by shippers.

"Q. You mean by shippers, shippers generally?

"A. Yes, sir; shippers generally, anybody who wants to ship a carload of freight will get his car on the track."

The testimony given by other witnesses did not materially add to or affect this evidence, though the other testimony and the cross-examination of the superintendent tended to show that in order to render the general public use of the spur track practicable and convenient, grading, the construction of retain-

ing walls, and the improvement and change of grade of Fontaine street, would be required. It was shown that the tobacco company agreed, in writing, to give to the railway company a part of the land over which the spur track was to be constructed and to pay the cost of the remainder. The railway company, on the other hand, agreed to continue the operation of the spur track as long as the tobacco factory was operated, but reserved the option to abandon the spur track in case the factory was abandoned for six months. In that case the land given by the tobacco company was to revert to it.

*Mr. Abram P. Staples* and *Mr. Waller R. Staples*, with whom *Mr. John W. Carter* was on the brief, for plaintiff in error.

*Mr. George E. Hamilton*, with whom *Mr. Michael J. Colbert* was on the brief, for defendant in error.

MR. JUSTICE MOODY, after making the foregoing statement, delivered the opinion of the court.

The condemnation of land in this case has been held by the courts of Virginia to be authorized by the constitution and laws of that State, and we have no right to review that aspect of the decision. The law of Virginia permits no exercise of the right of eminent domain except for public uses. *Fallsburg Power Company* v. *Alexander*, 101 Virginia, 98; *Dice* v. *Sherman*, 59 S. E. Rep. 388. Therefore it must be assumed that this taking was held to be for public uses, although there was no specific finding of the fact, but only a general judgment of condemnation. The plaintiff in error, however, insists that the record in this case, which includes all the evidence, shows, unmistakably, that the taking was for private uses and that the claim by the railway company, that the spur track was designed in part for public uses, is no better than a colorable pretense. We assume that, if the condemnation was for private uses, it is forbidden by the Fourteenth Amendment. *Missouri Pacific Railway* v. *Nebraska*, 164 U. S. 403; *Fallbrook Irrigation Dis-*

*trict* v. *Bradley,* 164 U. S. 112, 161; *Traction Company* v. *Mining Company*, 196 U. S. 239, 251, 252, 260; *Clark* v. *Nash*, 198 U. S. 361, 369; *Strickley* v. *Highland Boy Mining Co.*, 200 U. S. 527.

We proceed to consider whether the uses of the spur track for which the land was taken were private, and therefore such uses for which a taking by the right of eminent domain is forbidden by the Fourteenth Amendment. The courts of the States, whenever the question has been presented to them for decision, have, without exception, held that it is beyond the legislative power to take, against his will, the property of one and give it to another for what the court deems private uses, even though full compensation for the taking be required. But, as has been shown by a discriminating writer (1 Lewis on Eminent Domain, 2d ed., sec. 157), the decisions have been rested on different grounds. Some cases proceed upon the express and some on the implied prohibitions of state constitutions, and some on the vaguer reasons derived from what seems to the judges to be the spirit of the Constitution or the fundamental principles of free government. The rule of state decision is clearly established and we have no occasion here to consider the varying reasons which have influenced its adoption. But when we come to inquire what are public uses for which the right of compulsory taking may be employed, and what are private uses for which the right is forbidden we find no agreement, either in reasoning or conclusion. The one and only principle in which all courts seem to agree is that the nature of the uses, whether public or private, is ultimately a judicial question. The determination of this question by the courts has been influenced in the different States by considerations touching the resources, the capacity of the soil, the relative importance of industries to the general public welfare, and the long-established methods and habits of the people. In all these respects conditions vary so much in the States and Territories of the Union that different results might well be expected. Some cases illustrative of the tendency of local conditions to affect the judgment of courts are *Hays* v. *Risher*, 32 Pa. St. 169;

*Boston & Roxbury Mill Corp.* v. *Newman,* 12 Pick. 467 (conf. *Lowell* v. *Boston,* 111 Massachusetts, 454); *Turner* v. *Nye,* 154 Massachusetts, 579; *Ex parte Bacot,* 36 S. C. 125; *Dayton Mining Co.* v. *Seawell,* 11 Nevada, 394; *Mining Co.* v. *Parker,* 59 Georgia, 419; *Head* v. *Amoskeag Manufacturing Company,* 113 U. S. 9; *Clark* v. *Nash,* 198 U. S. 361; *Strickley* v. *Highland Boy Mining Co.,* 200 U. S. 527; *Otis Co.* v. *Ludlow Co.,* 201 U. S. 140. The propriety of keeping in view by this court, while enforcing the Fourteenth Amendment, the diversity of local conditions and of regarding with great respect the judgments of the state courts upon what should be deemed public uses in that State, is expressed, justified, and acted upon in *Fallbrook Irrigation District* v. *Bradley, ub. sup., Clark* v. *Wells, ub. sup.* and *Strickley* v. *Highland Boy Mining Co., ub. sup.* What was said in these cases need not be repeated here. No case is recalled where this court has condemned as a violation of the Fourteenth Amendment a taking upheld by the state court as a taking for public uses in conformity with its laws. In *Missouri Pacific Railway* v. *Nebraska, ub. sup.,* it was pointed out (p. 416) that the taking in that case was not held by the state court to be for public uses. We must not be understood as saying that cases may not arise where this court would decline to follow the state courts in their determination of the uses for which land could be taken by the right of eminent domain. The cases cited, however, show how greatly we have deferred to the opinions of the state courts on this subject, which so closely concerns the welfare of their people. We have found nothing in the Federal Constitution which prevents the condemnation by one person for his individual use of a right of way over the land of another for the construction of an irrigation ditch; of a right of way over the land of another for an aërial bucket line; or of the right to flow the land of another by the erection of a dam. It remains for the future to disclose what cases, if any, of taking for uses which the state constitution, law, and court approve will be held to be forbidden by the Fourteenth Amendment to the Constitution of the United States.

Entering upon the consideration of the case at bar in the spirit of our previous decisions, it presents no difficulties. The Virginia court has, in effect, found that the condemnation was for public uses. . The evidence fully warranted that finding. We need not consider whether a condemnation by a railroad, authorized by a state law and approved by the state court, of land for the construction of a spur track to be used solely to transport commodities to the main line and thence to the place of sale and consumption throughout the country, is a violation of the Fourteenth Amendment; nor the authorities bearing upon the question whether such a use is public. Here the proposed spur track can be used, and was designed to be used, not only for access to the factory of the tobacco company but for the storage of cars to be laden or unladen by receivers and shippers of freight, and to relieve the congestion of business which, through the growth of the town, overburdened the limited trackage of the railroad. We think the court below was justified in finding that the superintendent testified accurately when he said, "In order to meet the demands of the business, therefore, it is absolutely necessary to obtain more and better terminal facilities here;" and "We have located what we think to be the best and most feasible line to accomplish two objects— get the terminal facilities, and at the same time reach the plant of the Rucker & Witten Tobacco Co.;" and "It will be for the use of the public, in that cars loaded with carload shipments . . . will be placed on these tracks to be unloaded and empty cars will be placed on those tracks to be loaded by shippers." This testimony describes a use which is clearly public. *Railroad* v. *Porter*, 43 Minnesota, 527; *Ulmer* v. *Lime Rock Co.*, 98 Maine, 579; *Railway* v. *Morehouse*, 112 Wisconsin, 1; *Railway* v. *Petty*, 57 Arkansas, 359; *Zircle* v. *Railway*, 102 Virginia, 17. The uses for which the track was desired are not the less public because the motive which dictated its location over this particular land was to reach a private industry, or because the proprietors of that industry contributed in any way to the cost.

We have considered the elaborate argument of counsel that the track was not intended for the use of the public generally, and that it could not, in fact, be so used, and are not convinced by it. The judgment is

*Affirmed.*