## NORDGARD v. MARYSVILLE & N. RY. CO. et al.†

### (Circuit Court of Appeals, Ninth Circuit. November 9, 1914.)

### No. 2398.

COMMERCE (§ 27*)—WHAT CONSTITUTES INTERSTATE COMMERCE—EMPLOYERS' LIABILITY ACT—"ENGAGED IN INTERSTATE COMMERCE."

Defendant railroad company was owned by its codefendant mill company, and its road used as a logging road for the transportation of logs and poles from its timber lands in the state of Washington to Puget Sound, where they were placed in the water. A portion of the logs were thereafter sold to other mills, and the remainder manufactured by the mill company into lumber, which was afterward sold, some for use locally, and some for shipment to other states or countries. The poles, which were intended for piles and electric wire poles, were sold to a dealer, to whom they were delivered in the water, and he rafted and removed them, afterwards reselling them in the course of his business in that and other states. *Held*, that the logs, poles, or lumber did not become subjects of interstate commerce until committed to a carrier for transportation to another state, or started on their ultimate passage to that state, and that defendant railroad company was not engaged in interstate or foreign commerce, within the meaning of Employers' Liability Act April 22, 1908, c. 149, § 1, 35 Stat. 65 (Comp. St. 1913, § 8657).

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. § 27.*

For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

Ross, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Action at law by Gunder Nordgard against the Marysville & Northern Railway Company and the Stimson Mill Company. Judgment for defendants, and plaintiff brings error. Affirmed.

For opinion below, see 211 Fed. 721.

John T. Casey, of Seattle, Wash., for plaintiff in error.

Hughes, McMicken, Dovell & Ramsey, of Seattle, Wash., for defendants in error.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge.   In an action in the court below, brought by a brakeman of a railway train of the defendants in error to recover damages for personal injuries under the provisions of the Employers' Liability Act of Congress of 1908, the court below directed a verdict for the defendants, the defendants in error here, on the ground that the defendants were not engaged in interstate or foreign commerce.

The record shows that the defendant the Stimson Mill Company was engaged in the logging and lumber business, and carried logs on the Marysville & Northern Railway Company, its logging road, from its own timber lands in the forest to the waters of Puget Sound.   It dumped all its logs into those waters.   A portion of the logs was thereafter sold to various mills on the Sound, and the remainder was taken to the defendant's mill at Ballard, and there manufactured into lumber.   The lumber was piled in the mill company's lumber yard. About 20 per cent. of it was sold in the local market, and the remainder, on orders thereafter obtained, was shipped to points in other states and countries.   A portion of the timber so hauled on the logging road consisted of poles for electric wires.

One Vollans, a dealer in cedar poles and piling, testified that he sold about 60 per cent. of his poles in California, and 40 per cent. locally.   He said:

"I bought the poles from them [the mill company], and they delivered them into the water at Ebey Slough, where they were received by me.   I paid so much a pole delivered in the water at Ebey Slough.   There I took the poles, rafted them, and towed them away."   "The contract was so much a thousand delivered into the water at Ebey Slough, including the hauling over the railroad."

The question is whether, under these facts, either of the defendants was engaged in interstate commerce over the logging road.   The Supreme Court has defined what is not and what is interstate commerce. In Coe v. Errol, 116 U. S. 517, 525, 6 Sup. Ct. 475, 477 (29 L. Ed. 715), the court said of goods in transit:

"There must be a point of time when they cease to be governed exclusively by the domestic law and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the state of their origin to that of their destination.   When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an entrepot for that particular region, whether on a river or a line of railroad, such products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the state to the state of their destination, or have started on their ultimate passage to that state."

The court quoted from the opinion in the case of The Daniel Ball, 10 Wall. 557, 565 (19 L. Ed. 999):

"Whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced."

And added:

"But this movement does not begin until the articles have been shipped or started for transportation from the one state to the other. The carrying of them in carts or other vehicles, or even floating them, to the depot where the journey is to commence, is no part of that journey. * * * Until actually launched on its way to another state, or committed to a common carrier for transportation to such state, its destination is not fixed and certain. It may be sold or otherwise disposed of within the state, and never put in course of transportation out of the state."

The language so used in that opinion applies in every particular to the facts in the present case. The poles which were sold to Vollans' were not shipped to him from the logging camp, but were sold and delivered to him at tide water. There he took them and towed them away. The testimony does not disclose to what point he towed them, but we may assume that he towed them to a storing place which answered for his warehouse, where he kept his stock in trade, out of which he sold his poles and piling, and where the poles lay until they were sold to customers. It was not known and could not be determined that any particular poles or particular car load of poles were, while being carried on the defendant's road, on their way to a foreign market. As was said in Coe v. Errol, they might be sold or otherwise disposed of within the state, "and never put in course of transportation out of the state."

The cases which are cited to sustain the view that these poles were, while on the defendant's road, in the course of interstate transportation, have not in any way modified the principles announced in Coe v. Errol, but, on the contrary, have reaffirmed the same, and in each case there has been quoted the rule of Mr. Justice Bradley in Coe v. Errol that the test is whether the goods have commenced their final movement for transportation from the state of their origin to that of their destination.

In Texas & N. O. R. R. Co. v. Sabine Tram Co., 227 U. S. 111, 33 Sup. Ct. 229, 57 L. Ed. 442, lumber was ordered manufactured and shipped for export through a port where there was no local trade, and it was there shipped to its final destination by a vessel not designated before arrival. The court held that a continuous line of shipments through the same port to foreign ports of merchandise in which there is no local trade shows a continuity of transportation which is not broken by a mere delay in transshipment.

In Louisiana R. R. Comm. v. Texas & Pac. Ry. Co., 229 U. S. 336, 33 Sup. Ct. 837, 57 L. Ed. 1215, the court, while holding that a shipment intended for export to a foreign country but shipped to the exporting seaport on local bills of lading, was interstate commerce, said:

"The shipments were in the physical custody of the railroad company until arrival at New Orleans, and thereafter in the physical custody of the steamships, which issued bills of lading therefor to the shippers of the cargo."

In So. Pac. Terminal Co. v. Int. Com. Comm., 219 U. S. 498, 31 Sup. Ct. 279, 55 L. Ed. 310, the goods were all destined for export and were shipped on initial bills of lading to a terminal in the same state where they were to be delivered to a carrier for a foreign destination. The court held, following Coe v. Errol, that goods destined

for export are ·necessarily in interstate, as well as in foreign, commerce, when they actually start in the course of transportation to another state, or are delivered to a carrier for transportation.

In line with these decisions is Ohio R. R. Comm. v. Worthington, 225 U. S. 101, 32 Sup. Ct. 653, 56 L. Ed. 1004. In that case coal was shipped from points in the state of Ohio to "on board" vessels at the port of Huron, but it was all intended for shipment to some point beyond the state, undetermined at the time of shipment, but determined after arrival at Port Huron. The court said:

"By every fair test the transportation of this coal from the mine to the upper Lake ports is an interstate carriage, intended by the parties to be such."

In all of these cases the goods, from the time of their initial shipment, were all on their way to points in another state or country. There might be a pause or delay at a point of transshipment; there might be uncertainty of identity of connecting carriers; there might even be uncertainty as to the precise point of their ultimate destination; but in each case it could be positively affirmed that from the beginning of their transportation they were all in course of transit to points beyond the state in which the original shipment was made.

In the case at bar there was no initial shipment of the goods. The transportation of the poles from the forest in which they were cut to tide water, where they were sold, was not a shipment. There was no contract of carriage; there was no bill of lading; there was no consignor or consignee. The goods were not committed to a carrier. The defendant mill company simply carried over its own road, on its own cars, its own goods to a market where it sold and delivered them. It had no concern with the subsequent disposition of them. It was under no obligation to deliver them to another carrier, and no other carrier was under obligation to receive them or carry them further. The selling of the poles after the first sale by the mill company, or whether they were going outside of the state, depended upon chance or the exigencies of trade. The movement of the poles did not become interstate commerce until by the act of the purchasers thereof the poles were started on their way to their destination in another state or country. The beginning of the transit which constitutes interstate commerce—

"is defined in Coe v. Errol to be the point of time that an article is committed to a carrier for transportation to the state of its destination, or started on its ultimate passage." General Oil Co. v. Crain, 209 U. S. 211, 229, 28 Sup. Ct. 475, 52 L. Ed. 754.

We find no error. The judgment is affirmed.

ROSS, Circuit Judge (dissenting). This is a personal injury case, and the real question is whether either of the defendants in error was, at the time the plaintiff in error received the injuries for which he sued, a carrier by railroad engaged in interstate commerce—the action being based upon the Employers' Liability Act of Congress of 1908 (35 Stat. 65). If so, then manifestly the plaintiff in error was likewise so engaged, as he was one of the brakemen of one of the

railroad trains of the defendants in error at the time of his injury. The trial court granted a motion of the defendants for a directed verdict in their favor, which having been returned, and a judgment against the plaintiff below entered, he sued out the present writ of error.

The substantial facts appear to be these: ' The defendant in error Stimson Mill Company is the owner of a large body of timber land in Snohomish county, state of Washington, which it is engaged in logging, and it also owns and operates a large lumber mill at Ballard, a suburb of the city of Seattle, of that state. For the purpose of transporting its logs, it caused the defendant in error Marysville & Northern Railway Company to be incorporated and pays the costs of its operation. That company was incorporated under the general laws of Washington applicable to railroads, with the incidental power of eminent domain, and constructed a line of railroad about 16 miles long, extending from the vicinity of the logging operations of the mill company to a point on Ebey Slough, one of the mouths of the Snohomish river near the town of Marysville in Snohomish county. The road was connected with the Northern Pacific and Great Northern Railroads, although the only transportation it appears to have done, apart from the specific instances to be mentioned, has been the carrying of the logs of the Stimson Mill Company from its timber lands to Ebey Slough, into which they are dumped, and there a part of them are sold by the Stimson Mill Company to other manufacturers, the remainder being by the mill company rafted and towed to Ballard, where they are sawed into lumber by it, and the hauling of the supplies for the mill company's logging camp, which the railroad company carries free. It further appears from the evidence that on one occasion some gravel was carried by the railroad to the town of Marysville for street purposes, on which no freight was charged, and that on another occasion a car load of lumber was hauled for a friend of the mill company who was starting a logging camp in its vicinity, and for which he was charged only the actual cost of the haul. And the evidence also shows that the mill company sold certain poles and piling, cut from its timber lands and hauled by the railroad, to one Vollans, who sold and sent about 60 per cent. of them to various parties in the state of California,' which poles and piling were sold by the mill company to Vollans, delivered in the waters of Ebey Slough.

It further appears that the cars used on the railroad consist of trucks on which the logs are loaded and made fast at either end by chains, there being two brakemen on each train of cars, each of whom assist in loosening the chains and dumping the logs into the water. It was while engaged in that operation that the plaintiff received the injuries complained of by him. These further facts are also made to appear: The mill mentioned has a capacity of about 175,000 feet of lumber in 10 hours, and manufactures its lumber chiefly from the logs cut from the lands of the Stimson Company, from 20 to 25 per cent. of which is sold in the local market and delivered to the purchasers at the mill, the balance being sold for shipment out of the state of Washington either by water or rail, and delivered on board vessels or cars

to the purchaser at Ballard, and billed as directed by the purchaser. When orders are received by the mill company for lumber to be shipped by water, the lumber is piled on the dock, from which a steamer takes it, and where sold for shipment by rail the mill company loads it on board cars, and it is paid for at Ballard by the local agent of the buyer, who directs its destination.

The sole question, as has been said, is whether the defendants in error were at the time in question engaged in interstate commerce within the meaning of the act of Congress above referred to. In the case of United States and Interstate Commerce Commission, Appellants, v. Louisiana & Pacific Railway Company et al., 234 U. S. 1, 34 Sup. Ct. 741, 58 L. Ed. 1185, and similar cases, numbered respectively 829, 830, 831, 832, 833, 834, 835, and 836, decided by the Supreme Court May 25, 1914, involving the true character of certain logging roads, that court said, among other things:

"Are they plant facilities merely, or common carriers with rights and obligations as such? It is insisted that these roads are not carriers, because the most of their traffic is in their own logs and lumber, and that only a small part of the traffic carried is the property of others. But this conclusion loses sight of the principle that the extent to which a railroad is in fact used does not determine the fact whether it is or is not a common carrier. It is the right of the public to use the road's facilities and to demand service of it, rather than the extent of its business, which is the real criterion determinative of its character. This principle has been frequently recognized in the decision of the courts. We need not cite the many state cases in which it has been so held, in view of the fact that the same principle was laid down in the late case of Union Lime Co. v. Chicago & N. W. Ry. Co., 233 U. S. 211 [34 Sup. Ct. 522, 58 L. Ed. 924]. In that case the Supreme Court of Wisconsin sustained the extension of a spur track to reach the quarries and limekilns of a single company as a public use, authorizing the exercise of the right of eminent domain, and this court affirmed the judgment. Dealing with the contention that the Wisconsin statute was invalid because it authorized action appropriating property upon the exigency of a private business, this court said (233 U. S. 221 [34 Sup. Ct. 525, 58 L. Ed. 924]): 'A spur may, at the outset, lead only to a single industry or establishment; it may be constructed to furnish an outlet for the products of a particular plant; its cost may be defrayed by those in special need of its service at the time. But none the less, by virtue of the conditions under which it is provided, the spur may constitute at all times a part of the transportation facilities of the carrier which are operated under the obligations of public service and are subject to the regulation of public authority. As was said by this court in Hairston v. Danville & Western Rwy. Co., supra (208 U. S. 598 [28 Sup. Ct. 331, 52 L. Ed. 637, 13 Ann. Cas. 1008]): "The uses for which the track was desired are not the less public because the motive which dictated its location over this particular land was to reach a private industry, or because the proprietors of that industry contributed in any way to the cost." There is a clear distinction between spurs which are owned and operated by a common carrier as a part of its system and under its public obligation and merely private sidings. See De Camp v. Hibernia R. R. Co., 47 N. J. Law, 43; Chicago, etc., R. R. Co. v. Porter, 43 Minn. 527 [46 N. W. 75]; Ulmer v. Lime Rock R. R. Co., 98 Me. 579 [57 Atl. 1001, 66 L. R. A. 387]; Railway Co. v. Petty, 57 Ark. 359 [21 S. W. 884, 20 L. R. A. 434]; Dietrich v. Murdock, 42 Mo. 279; Bedford Quarries R. R. Co. v. Chicago, etc., R. R. Co., 175 Ind. 303 [94 N. E. 326, 35 L. R. A. (N. S.) 641].' "

Applying the principle there referred to to the facts of the present case, I am of opinion that the railroad company here involved is a common carrier. While the chief purpose of its construction undoubtedly

was the transportation of logs cut from the lands of the Stimson Mill Company, it was by virtue of its charter legally bound to carry the logs and other property of the public, and, as the facts show, did on occasion do so. At what charge, or whether without charge, is unimportant; it was clearly entitled to compensation for such transportation, and to the establishment of proper rates therefor. The record shows that a part of the business in which the mill company was engaged was the cutting and selling of poles and piling from its timber lands. The witness Vollans testified on behalf of the complainant in the case—plaintiff in error here—as follows:

"I am a dealer in cedar poles and piling, and in my business have dealt with the Stimson Mill Company and the Marysville & Northern Railway. During the year 1912 they hauled poles and piling for me; I paid them for it. I sell about 60 per cent. of them in California, and 40 per cent. locally. * * * My dealings were entirely with the Stimson Mill Company. I bought the poles from them, and they delivered them into the water at Ebey Slough, where they were received by me. I paid so much a pole delivered in the water at Ebey Slough. There I took the poles, rafted them, and towed them away. This was prior to April, 1912. * * * The contract was so much a thousand delivered in the water at Ebey Slough, including the hauling over the railroad."

It will be observed that the witness there distinctly testified that the defendants in error hauled the poles and piling so bought for the purchaser, about 60 per cent. of which he sold in California, and that the poles and piling so bought and hauled for compensation duly paid were delivered to him in the water at Ebey Slough, from which place he towed them away tied together. If knowledge on the part of the defendants in error that a part of such poles and piling were intended for continuous transportation by the purchaser to another state be essential, such knowledge, I think, might well have been found by the jury from the testimony of Vollans.

The opinion of the majority of the court is based, as it seems to me, upon the assumption that the place in Ebey Slough where the mill company dumps all the logs cut from its lands is a sort of gathering place or rendezvous *at and from which only* it sells its logs, and consequently that the defendants in error are unaffected by anything any purchaser of any part thereof may do with what he purchases. Says the court in its opinion:

"In the case at bar there was no initial shipment of the goods. The transportation of the poles from the forest in which they were cut to tide water, where they were sold, was not a shipment. There was no contract of carriage; there was no bill of lading; there was no consignor or consignee. The goods were not committed to a carrier. The defendant mill company simply carried over its own road, on its own cars, its own goods to a market where it sold and delivered them. It had no concern with the subsequent disposition of them."

I do not see how that can be properly affirmed in this case, in view of the testimony of the witness Vollans. Even if there were any contradiction of his testimony, which, however, the record fails to show, his credibility was a question for the jury, and not for either the trial court or this court. If true, it seems to me to show that the poles and piling he purchased were cut for him by the mill company from its timber

lands for the purpose of being, in part, transported to the state of California, first by the railroad owned by the mill company, which I think I have shown should be regarded as a common carrier, to the waters of Ebey Slough, into which they were by the contract with Vollans to be dumped, and where he was to receive them for continuous transportation by water to California. Whether by ship or raft is wholly unimportant. Such of the poles and piling as were designed for the California trade did, in my opinion, begin to move from the state of Washington to the state of California when they left the lands of the mill company under the contract testified to by Vollans; and, if that contract was in fact made and acted on as testified to, the commencement of the movement of such poles and piling constituted, in my opinion, commerce between the two states mentioned, within the decision of Coe v. Errol, 116 U. S. 517, 6 Sup. Ct. 475, 29 L. Ed. 715, and other decisions of that court referred to in the opinion of this court herein. The principle annunciated in the cases of Louisiana R. R. Comm. v. Tex. & Pac. Ry. Co., 229 U. S. 336, 33 Sup. Ct. 837, 57 L. Ed. 1215, Southern Pac. Terminal Co. v. Int. St. Com. Comm., 219 U. S. 498, 31 Sup. Ct. 279, 55 L. Ed. 310, Ohio Railroad Comm. v. Worthington, Receiver, 225 U. S. 101, 32 Sup. Ct. 653, 56 L. Ed. 1004, and Texas & N. O. R. R. Co. v. Sabine Tram Co., 227 U. S. 111, 33 Sup. Ct. 229, 57 L. Ed. 442, is that "it is the essential character of the commerce," not its mere incidents, which determines its true character, and that it "takes character as interstate or foreign commerce when it is actually started in the course of transportation to another state or to a foreign country."

For the reasons above stated, I think the judgment should be reversed, and the cause remanded to the court below for a new trial.