#28174-aff in pt & rev in pt-DG
**2017 S.D. 88**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

MONTANA-DAKOTA UTILITIES CO.
and OTTER TAIL POWER COMPANY,                    Plaintiffs and Appellees,

            v.

PARKSHILL FARMS, LLC,
REUBEN PARKS, VERA PARKS,
and ORDEAN PARKS,                                         Defendants and Appellants,

and

WEB WATER DEVELOPMENT
ASSOCIATION, INC., KERMIT
PARKS, and ESTATE OF ORION
E. PARKS,                                                             Defendants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
DAY COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE TONY L. PORTRA
Judge
\* \* \* \*

JASON R. SUTTON
THOMAS J. WELK of
Boyce Law Firm
Sioux Falls, South Dakota                                Attorneys for plaintiffs
                                                                              and appellees.

N. BOB PESALL
Flandreau, South Dakota                                 Attorney for defendants
                                                                              and appellants.

\* \* \* \*

ARGUED OCTOBER 2, 2017
OPINION FILED **12/13/17**

#28174

GILBERTSON, Chief Justice

[¶1.] Through formal condemnation proceedings, Montana-Dakota Utilities Co. and Otter Tail Power Co. (collectively, "Utilities") obtained easements to construct a powerline across four parcels belonging to Parkshill Farms LLC and Reuben, Vera, and Ordean Parks.[1] The Parkses appeal, arguing that the easements were not taken for a public use and that they are unnecessary. The Parkses also argue the circuit court abused its discretion when it rejected a jury instruction requested by the Parkses. We affirm in part, reverse in part, and remand.

**Facts and Procedural History**

[¶2.] Montana-Dakota Utilities Co. is a public utility that provides electricity to about 135,000 customers in South Dakota, Montana, North Dakota, and Wyoming. Otter Tail Power Co. is a public utility that provides electricity to over 130,000 customers in South Dakota, Minnesota, and North Dakota. These utility companies are members of the Midwest Independent Service Operator ("MISO"), which is a nonprofit organization created to regulate the planning, construction, and management of electricity transmission in the upper Midwest, including South Dakota. MISO, in turn, is subject to regulation and control by the Federal Energy Regulatory Commission ("FERC"). Under FERC guidelines, public utilities that participate in the interstate electricity market must provide open access to their transmission lines under nondiscriminatory rates and conditions to anyone participating in the market.

---

1. The Utilities' petition also named Web Water Development Association, Inc., Kermit Parks, and the Estate of Orion E. Parks as additional defendants. These additional defendants are not parties to this appeal.

-1-

[¶3.]     In order to facilitate electricity generation and to promote reliable service in its geographic area, MISO continually evaluates the needs of its transmission system and considers projects to improve that system. At issue in this case, MISO determined a high-voltage (345 kilovolt) transmission line should be constructed between a substation located south of Big Stone City, South Dakota, and another substation located near Ellendale, North Dakota. The line is 163 miles long, with 10 miles of line located in North Dakota and the rest in South Dakota. This transmission line is commonly referred to as the "Big Stone South to Ellendale" project—or "BSSE."[2] After MISO's board of directors approved the project, the Utilities were required to construct the transmission line. After months of consideration,[3] the Utilities picked a route and began negotiating with the affected property owners. The Utilities successfully negotiated voluntary easements over 91% of the parcels along the BSSE's proposed route. The Parkses were among a few who refused settlement.

[¶4.]     Unable to secure voluntary easements from the Parkses, the Utilities filed a condemnation petition on October 28, 2015. In the petition, the Utilities sought permanent, 150-foot-wide easements "for the purpose of constructing, operating, [and] maintaining an overhead electric transmission line up to but not

---

2.     The BSSE was one of 17 projects that MISO deemed necessary in its geographic area.

3.     The Utilities began the process of selecting a route in Fall 2012. After 15 months of study and dialogue with potentially affected property owners, the Utilities selected a tentative route. The Utilities then considered and analyzed approximately 60 requests to change the selected route.

exceeding 345kV over, under and across" the Parkses' properties. The proposed easements included the right to

> construct, operate, maintain, use, upgrade, build, rebuild, relocate, or remove an electric line facility with one or more circuits, with all towers, structures, poles, foundations, crossarms, cables, wires, anchors, guys, supports, counterpoises, fixtures and equipment related to said electric line facility, together with communication equipment relating to the operation of such electric line facility . . . through, over, under and across [the Parkses' property.]

The circuit court held a hearing on April 5, 2016, to determine the Utilities' right to take the easements. The Parkses challenged both the scope and the duration of the proposed easements. The court approved the petition, and on January 25 and 26, 2017, the case proceeded to a jury trial to determine the amount of compensation due for the easements.

[¶5.] At trial, the Parkses' real-estate appraiser testified the market value of their properties would diminish by $840,000 as a result of the proposed easements. The Utilities' real-estate appraiser valued the easements at only $73,097. Although the easements included the right to construct a number of supporting structures and features, *see supra* ¶ 4, the Utilities' witnesses testified that it was extremely unlikely the Utilities would exercise these additional rights. In response, the Parkses requested a jury instruction that would have required the jury to "consider all damages, present and prospective, that will accrue reasonably from the taking of the easement, and in so doing must consider the most injurious use of the property reasonably possible under the easement." The court rejected the requested instruction. The jury ultimately awarded $95,046 to the Parkses and the other landowners.

[¶6.]    The Parkses appeal, raising the following issues:

1.    Whether the easements were taken for a public use.

2.    Whether the easements were necessary.

3.    Whether the circuit court abused its discretion by refusing the Parkses' requested jury instruction.

**Analysis and Decision**

[¶7.]    The power to take privately owned property and put it to public use is "an inherent right vested in a sovereign state as a necessary attribute thereof." *Darnall v. State*, 79 S.D. 59, 63, 108 N.W.2d 201, 203 (1961).  In South Dakota, the Legislature has delegated this power of eminent domain to "[a]ny corporation organized under [SDCL] chapter 49-33[,]" SDCL 49-34-4, which includes electric utilities.  When such a public utility seeks to invoke its delegated power, it must show:

> (1) [t]hat [it] is within the class to whom the power has been delegated[,] (2) [t]hat all conditions precedent have been complied with[,] (3) [t]hat the purpose for which the property is to be taken is one of the purposes enumerated in the statute[,] (4) [t]hat the property is to be taken for a public use[, and] (5) [t]hat the particular property sought to be taken is necessary to the accomplishment of the public purpose intended.

*Ill. Cent. R.R. Co. v. E. Sioux Falls Quarry Co.*, 33 S.D. 63, 71, 144 N.W. 724, 726 (1913) (emphasis omitted).  The Parkses do not dispute the Utilities have met their burden in regard to the first three elements.  Instead, this case involves the public-use and necessity requirements.

[¶8.]    *1.    Whether the easements were taken for a public use.*

[¶9.]    As an initial matter, the parties disagree on the applicable standard of review.  The Parkses request de novo review, contending this issue involves constitutional and statutory interpretation.  The Utilities respond that the dispute

in this issue is largely a factual matter that should be reviewed under the clearly erroneous standard. Both parties are correct to some extent. Determining whether the nature of a proposed use is public or private "is ultimately a judicial question." *Id.* at 77, 144 N.W. at 728 (quoting *Hairston v. Danville & W. Ry. Co.*, 208 U.S. 598, 606, 28 S. Ct. 331, 334, 52 L. Ed. 637 (1908)). Thus, the ultimate issue in this case is a question of law. *Locklin v. City of Lafayette*, 867 P.2d 724, 751 (Cal. 1994) (en banc). Questions of law are reviewed de novo. *Coffey v. Coffey*, 2016 S.D. 96, ¶ 7, 888 N.W.2d 805, 808. However, the factual findings on which those conclusions are premised are reviewed under the clearly erroneous standard. *Id.*

[¶10.] The Parkses argue their property was not taken for a public use. Our cases have long subscribed to the view that the term *public use*, as used in Article VI, simply means "use by the public[.]" *Ill. Cent. R.R.*, 33 S.D. at 78, 144 N.W. at 728. "[T]he matter that is controlling . . . is not the *necessity* of the use, not even the *fact* of use, but the *right* to use." *Id.* at 78, 144 N.W. at 729. The Parkses contend "[t]he public does not have the right to use the easements, or the transmission line, on the same terms as the Utilities who would establish it." According to the Parkses, the Utilities "would take the easements in fee simple" and could "close it up and prohibit all or any part of the public from its use" or "sell the easements to third parties who could do the same." In essence, the Parkses argue that in order to satisfy the public-use clause, the general public must be entitled to use the condemned property in the same manner as the *condemning authority*.

[¶11.] The Parkses' view of the public-use requirement is untenable. The rights acquired by a condemning authority are often by necessity broader than the

right of use acquired by the general public. For example, when the State or a railroad condemns a right-of-way across privately owned land for the purpose of constructing and operating a highway or track, the condemning authority acquires the rights to *construct* and *operate* the highway or track (as well as necessary incidental powers), whereas the general public acquires only the right to *use* the highway or track so constructed. It would be physically impossible to ensure that every member of the public had the *right* to use the condemned right-of-way "on the same terms" as the condemning authority—i.e., to *construct* and *operate* his or her own highway or track. Under the Parkses' reading of the public-use clause, then, it would essentially be impossible for the State or a railroad to condemn a right-of-way to construct and operate a highway or track "for public use."

[¶12.] In contrast to the Parkses' argument, determining whether the nature of a proposed use is public requires a comparison of the rights acquired by members of the public against other members of the public. In *Illinois Central Railroad*, for example, the railroad condemned a right-of-way to construct a spur track for the benefit of a single member of the public, a private stone quarry. *Id.* at 71, 144 N.W. at 725. The property owner challenged the taking, arguing that the general public would not use the spur track and that the right-of-way was taken for the private use of the quarry. *Id.* at 71-72, 144 N.W. at 725-26. This Court held the taking was for a public use because even if the general public did not utilize the spur track, "no person [could] be denied an equal right [*with the individual for whom the spur was constructed*] to the use of such spur." *Id.* at 81, 144 N.W. at 729-30. Notably, this Court focused on whether the public generally acquired a right to use the track; the

Court did not focus on the incidental powers acquired by the condemning authority to construct the track.

[¶13.] The same analysis is equally applicable in the present case. In the case of a public-service corporation like a railroad or electric utility,

> whether a use is public . . . may be determined by the fact that, where the use is public, a trust attaches to the subject condemned for the benefit of the public, of the enjoyment of which it cannot be deprived by the company without a reasonable excuse, and by the further fact that the state retains the power to regulate and control the franchises of the company, and to prescribe the amount of charges and tolls which it shall be lawful for the company to exact for the [public service provided].

*Id.* at 80, 144 N.W. at 729 (quoting *Zircle v. S. Ry. Co.*, 45 S.E. 802, 803 (Va. 1903)). In other words, "the public must have a right *to make use of the service offered* at reasonable rates and without discrimination. Serving the public cannot be the arbitrary choice or whim of the condemning party." 2A Julius L. Sackman, *Nichols on Eminent Domain* § 7.05[2][b] (3d ed., rel. 90-6/2008) (emphasis added). "As long as every member of the public has an equal right to use the power produced by the facility, it does not matter how many use the power or that not every person benefits from the facility's use." *Id.* § 7.05[4][d].

[¶14.] In this case, the nature of the proposed use of the easements is public. The circuit court found that the Utilities are public utilities. As such, they are *required* by law to "furnish adequate, efficient, and reasonable service." SDCL 49-34A-2. The Utilities may not, "except in cases of emergency, fail to provide, discontinue, reduce or impair service to a community, or a part of a community, except for nonpayment of account or violation of rules and regulations, unless permission has been first obtained from the Public Utilities Commission to do so."

SDCL 49-34A-2.1. And as noted above, federal regulations require the Utilities to provide open access to their transmission lines under nondiscriminatory rates to others in the market. Because the Utilities are required to provide nondiscriminatory, government-regulated service to the general public, the easements at issue were taken for public use. *See Ill. Central R.R.*, 33 S.D. at 80, 144 N.W. at 729; *Barham v. S. Cal. Edison Co.*, 88 Cal. Rptr. 2d 424, 430 (Cal. Ct. App. 1999) ("[G]enerally, condemning private property for the transmission of electrical power is a public use . . . ."); *Race v. Iowa Elec. Light & Power Co.*, 134 N.W.2d 335, 337 (Iowa 1965); *Mont. Power Co. v. Bokma*, 457 P.2d 769, 773-74 (Mont. 1969); *Grice v. Vt. Elec. Power Co.*, 956 A.2d 561, 571 (Vt. 2008).[4]

[¶15.]     ***2.     Whether the easements were necessary.***

[¶16.]     The Parkses also argue that because the easements obtained in North Dakota are limited to 99 years in duration, it was not necessary for the Utilities to take perpetual easements in South Dakota. They also contend the scope of the easements is broader than the Utilities' intended use. Again, the parties disagree on the applicable standard of review. The Parkses contend this issue presents a question of law reviewable de novo. The Utilities contend this Court's standard of review is limited by SDCL 21-35-10.1, which states, in part: "The finding of

---

4.     In their public-use analysis, the Parkses also contend that property may not be appropriated for a longer period than the public will have a right to use it. In essence, the Parkses suggest the public-use requirement creates a reversionary interest in the condemnee that attaches to all property rights acquired through condemnation. But the Parkses offer no authority for this proposition. Regardless, it is not necessary to answer this question because the Parkses' argument still turns on the necessity of the particular property interest taken in this case (i.e., a perpetual easement). As such, the duration of the easements taken in this case is addressed below in Issue 2.

necessity by the [condemning authority], unless based upon fraud, bad faith, or an abuse of discretion, shall be binding on all persons." The Parkses claim SDCL 21-35-10.1 applies only when "considering whether the public actually needs the project, or when the physical dimensions of the taking are challenged."

[¶17.] De novo review is not appropriate for this issue. Shortly after statehood, in the 1913 decision *Illinois Central Railroad*, this Court recognized that "[t]he lawmakers of this state have *never* seen fit to clothe the courts with the power to deny to a [public-service] corporation the right to exercise the power of eminent domain, for the reason that 'no public necessity exists' for the exercise of such power . . . ." 33 S.D. at 76, 144 N.W. at 728 (emphasis added). Indeed,

> [i]t is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan *rests in the discretion of the legislative branch.*

*Kelo v. City of New London, Conn.*, 545 U.S. 469, 489, 125 S. Ct. 2655, 2668, 162 L. Ed. 2d 439 (2005) (emphasis added) (quoting *Berman v. Parker*, 348 U.S. 26, 35-36, 75 S. Ct. 98, 104, 99 L. Ed. 2d 27 (1954)); *accord Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 406, 25 L. Ed. 206 (1878) ("When the use is public, the necessity or expediency of appropriating any particular property is not a subject of judicial cognizance."). If the question whether a bulk transmission line is presently necessary is a legislative question, it will continue to be a legislative question 99 years from now. In this case, this Court is no better equipped to second guess the duration of these easements than it is the overall need for them in the first place.

[¶18.]     In light of the foregoing, the necessity of the duration of these easements is not a judicial question.  So in this case, this Court may not review the necessity of the easements under the de novo standard—i.e., decide whether the condemning authority's determination of necessity is correct.  *See State, Dep't of Game, Fish & Parks v. Troy Twp.*, 2017 S.D. 50, ¶ 14, 900 N.W.2d 840, 846 ("[A] court may not 'exercise or participate in the exercise of functions which are essentially legislative or administrative.'" (quoting *Fed. Radio Comm'n v. Gen. Elec. Co.*, 281 U.S. 464, 469, 50 S. Ct. 389, 390, 74 L. Ed. 969 (1930))).  However, this Court may review the condemning authority's decision-making process.  *See id.* ¶¶ 24, 33, 900 N.W.2d at 850-53 (reviewing nonjudicial administrative action under arbitrariness standard).  As required by SDCL 21-35-10.1, this Court is limited to reviewing the Utilities' necessity determination for "fraud, bad faith, or an abuse of discretion[.]"

[¶19.]     The Parkses do not claim the Utilities' decision is based on fraud or bad faith; instead, the Parkses contend the Utilities abused their discretion.

> The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations.  In order to have an "abuse" in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias.

*Basin Elec. Power Coop. v. Payne*, 298 N.W.2d 385, 388 (S.D. 1980) (quoting *Wendel v. Swanberg*, 185 N.W.2d 348, 351 (Mich. 1971)).  Electricity is a commodity in widespread demand not only presently but for the foreseeable future.  Thus, the

-10-

Utilities' decision to take perpetual easements is not grossly violative of fact and logic.

[¶20.] The Parkses also contend the Utilities abused their discretion by seeking "to take a variety of rights they have no intention of using." The Utilities took the easements for the purpose of "construction, operation, and maintenance of an electrical transmission line." Specifically, the Utilities obtained

> easement[s] . . . to construct, operate, maintain, use, upgrade, rebuild, relocate or remove an electric line facility with one or more circuits, with all towers, structures, poles, foundations, crossarms, cables, wires, anchors, guys, supports, counterpoises, fixtures, and equipment related to said electric line facility, together with communication equipment relating to the operation of such electric line facility . . . through, over, under and across [the Parkses'] lands[.]

During the jury trial on compensation, the Utilities indicated it was unlikely that they would need to construct guy wires, crossarms, cables, supports, counterpoises, or other fixtures or that they would rebuild, relocate, or remove the equipment actually installed. According to the Parkses, "[c]laiming that it is necessary to take rights that will not be exercised is an abuse of discretion."

[¶21.] The Utilities did not abuse their discretion in this regard either. Circumstances change, equipment fails, and technology evolves; the easements at issue simply account for such possibilities. The fact that the Utilities do not anticipate needing to relocate the transmission line, for example, does not mean the Utilities do not intend to do so should the need arise. Including these unanticipated-though-possible uses of the easement area actually benefits the Parkses. By doing so, the Utilities essentially admit that such uses of the property should be assumed in valuing the compensation due, thus relieving the Parkses of

the burden of proving that such uses are likely consequences of the taking. *See State ex rel. Dep't of Transp. v. JB Enters., Inc.*, 2016 S.D. 89, ¶ 27, 889 N.W.2d 131, 139 ("In assessing damages, it is not what the condemnor actually does, but what it acquires the right to do, that normally determines the quantum of damage." (quoting 5 Julius L. Sackman, *Nichols on Eminent Domain* § 16.01[1] (3d ed., rel. 112-12/2013))). This benefits both the Parkses and the courts by reducing the likelihood of future litigation. *See* 5 Sackman, *supra*, § 16.01[1] ("Such a standard obviates the necessity for the landowner or his or her successors in interest to litigate each time the condemnor changes or expands the use to which the appropriated parcel is put.").

[¶22.] It is also noteworthy that the Utilities took only perpetual easements with enumerated uses. The Utilities could have entirely condemned the 150-foot strip of land, taking fee simple—a perpetual estate consisting of all uses. But as things stand, the Parkses necessarily retain some rights to the easement area. Under the easements, the Parkses explicitly retain the right to "cultivate, use and occupy the Easement Area in a manner that is not inconsistent with [the Utilities'] rights granted" under the easements. The Parkses also retain the right to improve and maintain the easement area, subject to certain restrictions. This measured approach suggests the exercise of will, judgment, and reason rather than perversity of will, defiance of judgment, and passion or bias. *See Payne*, 298 N.W.2d at 388. Thus, the Utilities did not abuse their discretion.

[¶23.] ***3. Whether the circuit court abused its discretion by refusing the Parkses' requested jury instruction.***

[¶24.] Finally, the Parkses argue the circuit court erred by refusing their sixth requested jury instruction, which said:

> The Landowners' damages in this case include damages for all rights taken under the easement, not just those arising from the project proposed by the Plaintiffs. In considering damages for the rights taken under the easement, you must consider all damages, present and prospective, that will accrue reasonably from the taking of the easement, and in doing so must consider the most injurious use of the property reasonably possible under the easement.

The Utilities respond that the jury was adequately instructed under Instructions 5 and 11. Instruction 5 states:

> Montana-Dakota Utilities Company and Otter Tail Power Company are taking only a part of Parkshill Farms' property. The residue of the tract of land remains in Parkshill Farms' ownership.
>
> South Dakota uses the "before and after" formula to determine the just compensation to which the owner is entitled in a partial-taking case. Where only a portion of a property is condemned, the measure of just compensation includes both the value of the land actually taken and the value by which the residue, or remaining parcel, has been diminished, if any, as a consequence of the partial taking.
>
> To determine just compensation, first you must determine the "before value," which is the fair market value of the entire property before, and unaffected by, the taking. Then you must determine the "after value," which is the fair market value of the residue, or remaining parcel, after, and as affected by, the taking. The difference between the "before value" and "after value" will be the just compensation to which the defendant property owner is entitled and will also be the amount of your verdict.

Instruction 11 states:

> The estate or interest being taken by the Utilities in this proceeding is a permanent easement to enter upon the land belonging to the Landowners as shown and described in the maps and easement documents which have been received in evidence for the construction, operation, use, maintenance, repair and replacement of an electric transmission line facility,

> including the line, poles, and other related structures necessary for this purpose.
>
> When an easement is established across a particular tract of land by condemnation proceedings, just compensation is due to the landowner in that amount reasonably intended to compensate the owner for payment of the fair market value of *the specific land actually occupied by the electrical transmission line facility*, plus the reduction in value of the balance of the right-of-way taken, and the depreciation in value of the remaining tract of land. In considering the depreciation in value of the remaining tract of land, the elements of damage must not be remote, speculative or uncertain.

(Emphasis added.) The Parkses contend the portion of Instruction 11 emphasized above impermissibly directed the jury to "base their valuation on the project as proposed" rather than the rights actually acquired by the Utilities under the easements.

[¶25.]	We review the circuit court's decision to grant or deny a specific jury instruction for an abuse of discretion. *Karst v. Shur-Co.*, 2016 S.D. 35, ¶ 8, 878 N.W.2d 604, 609. But "whether a jury was properly instructed overall" is a question of law reviewed de novo. *Id.* (quoting *Vetter v. Cam Wal Elec. Coop., Inc.*, 2006 S.D. 21, ¶ 10, 711 N.W.2d 612, 615).

[¶26.]	Although Instructions 5 and 11 are accurate statements of the law, the jury instructions were inadequate as a whole. Instruction 5 correctly informed the jury that compensation is to be calculated by comparing the market values of the property before and after the taking. *Rupert v. City of Rapid City*, 2013 S.D. 13, ¶ 20, 827 N.W.2d 55, 64. And Instruction 11 correctly directed the jury to compensate the Parkses for the land actually occupied by the electric-transmission-line facility and the resulting diminution in value of the remainder of the property. *Neb. Elec. Generation & Transmission Coop., Inc. v. Tinant*, 90 S.D. 284, 291,

241 N.W.2d 134, 137-38 (1976). But these instructions do not account for other rights explicitly acquired—even though unused—under the easements. As noted above, when a condemning authority acquires the right to use private property in a specific manner, the owner of that property "must be compensated under the assumption that the [condemning authority] will" make use of that right. *JB Enters.*, 2016 S.D. 89, ¶ 27, 889 N.W.2d at 139 (citing 5 Sackman, *supra* ¶ 21, § 16.01[1]). Thus, the jury should have also been instructed to calculate compensation under the assumption that the Utilities will make use of the right to, e.g., install guy wires in the 150-foot easement area.

[¶27.]    Even so, the Utilities argue the Parkses' requested jury instruction does not accurately state the law. As noted above, the Parkses requested the circuit court to instruct the jury to "consider the most injurious use of the property reasonably possible under the easement." According to the Utilities, "[b]y basing compensation on a 'possible' use, proposed instruction number 6 invites the jury to impermissibly speculate." But contrary to the Utilities' characterization, the Parkses did not request the court to instruct the jury to consider the most injurious use possible—they requested the court to instruct the jury to consider the most injurious use *reasonably* possible. The common definition of the word *reasonably* excludes improbable events from consideration. *See Reasonable*, *Black's Law Dictionary* (10th ed. 2014) (defining the word *reasonable* as "[f]air, proper, or moderate under the circumstances; sensible"). Thus, the Parkses' requested instruction harmonizes with Instruction 11's proscription against considering "remote, speculative or uncertain" elements of damage.

[¶28.]     In light of the foregoing, we reverse and remand for a new trial on compensation. The circuit court is not required to adopt the specific language in the Parkses' requested instruction. The Utilities may propose their own version for consideration. But whatever instruction is given must be consistent with our holding in *JB Enterprises* that a property owner is entitled to compensation for any right explicitly taken by a condemning authority, regardless of whether the condemning authority ever uses such right. 2016 S.D. 89, ¶ 27, 889 N.W.2d at 139.

## Conclusion

[¶29.]     The easements were taken for a public use. The Utilities' determination of necessity was not an abuse of discretion. But the circuit court did not adequately instruct the jury on the appropriate measure of compensation due for the easements.

[¶30.]     We affirm in part, reverse in part, and remand.

[¶31.]     ZINTER, SEVERSON, and KERN, Justices, and WILBUR, Retired Justice, concur.

[¶32.]     JENSEN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.