**SCHNEIDER**

v.

**DISTRICT OF COLUMBIA et al.**

**MORRIS**

v.

**DISTRICT OF COLUMBIA REDEVELOPMENT LAND AGENCY et al.**

Civ. Nos. 5791–52, 476–53.

United States District Court
District of Columbia.

Nov. 5, 1953.

James C. Toomey, Toomey & Mehler, Washington, D. C., for plaintiff Morris.

Joseph H. Schneider, Washington, D. C., for plaintiff Goldie Schneider.

Vernon E. West, Corp. Counsel, Oliver Gasch, J. H. Baumgartner, Jr., Asst. Corp. Counsel, Washington, D. C., for defendants District of Columbia and Com'rs. of District of Columbia.

Leo A. Rover, U. S. Atty., Ross O'-Donoghue, Frank H. Strickler, Asst. U. S. Attys., Washington, D. C., for defendants Redevelopment Land Agency and National Capital Park & Planning Commission.

George F. Reisling, Gen. Counsel, Redevelopment Land Agency, Washington, D. C., William S. Cheatham, Gen. Counsel, National Capital Park & Planning Commission, Washington, D. C., of counsel for defendants.

Before PRETTYMAN, Circuit Judge, and KEECH, and CURRAN, District Judges.

PRETTYMAN, Circuit Judge.

These are two civil actions, consolidated, in which the constitutionality of the District of Columbia Redevelopment Act of 1945[1] is challenged. The defendant Government bodies and officials filed motions to dismiss or, in the alternative, for summary judgment. Affidavits, with exhibits attached, were annexed to the motions. The plaintiffs filed cross-motions for summary judgment.

The plaintiffs are the owners of properties, one at 712 and the other at 716 Fourth Street, Southwest, both in the District of Columbia. One property is a department store owned and operated by the plaintiff Morris, and the other property is a retail hardware store owned and operated by the plaintiff Schneider. The defendants are the members of the District of Columbia Redevelopment Land Agency, that Agency itself (a corporation), the members of the National Capital Park and Planning Commission (called in this statute the "Planning Commission"), the members of the Board of Commissioners of the District of Columbia, and the District of Columbia, a municipal corporation. The properties of the plaintiffs are located within the boundary lines of an area known in this litigation as "Project Area B".

This is the first project undertaken under the Redevelopment Act. The Planning Commission first published a Comprehensive Plan for the whole District of Columbia. Then it prepared a "Land Use Plan" for an area called the "Southwest Survey Area", which includes almost the whole of Southwest Washington. That plan, the Commission report says, "includes the Commission's proposals for the distribution of the basic land uses in the Survey Area, the population to be accommodated, the proportions of different housing types and the amount of low-rent housing which should be pro-

vided." The report recites as two of the principal proposals for the survey area:

"1. That the area continue to house about the same number of families.

"2. That the plan induce balanced and protected residential neighborhoods for all income groups, with approximately one-fourth of the housing designated for low-income families."

The locations of other survey areas have been prepared by the Commission, one a Northwest Survey Area and one a Southeast Survey Area. Out of the Southwest Survey Area the Commission selected a part, to be known as Project Area B, for the first redevelopment project. This is what is now before us.

The proposal of the Commission was approved by the Board of Commissioners of the District of Columbia. Thereafter the Planning Commission adopted a redevelopment plan for the area. The Land Agency made a detailed survey, using techniques considered standard by public authorities. A total of 1345 dwelling units in 1006 structures in the area housed a population of 5012. The survey indicated that 57.8 per cent of the dwellings depended upon outside toilets, 60.3 per cent had no "baths", 82.2 per cent no wash basins or laundry tubs, 29.3 per cent no electricity, and 83.8 per cent no central heating. The survey indicated that 64.3 per cent of the dwellings in the area were beyond repair and 18.4 per cent needed some major repairs.

After a public hearing the Commissioners approved the proposed redevelopment plan, and the Planning Commission certified it to the Land Agency for execution. Having obtained the necessary funds for preliminary steps from the Federal Housing and Home Finance Administrator, the Land Agency advertised for proposals to negotiate for the purchase or lease of land in the project area. After due consideration the Agency accepted the proposals of five bidders who owned property in the area (Safeway

1. 60 Stat. 790, D.C.Code § 5-701 et seq. (1951).

Stores, Inc., Martin Wiegand, Inc., Eagle Transfer Company, Max Greenwald, and Rudderforth Brothers), each to repurchase its present property, and of the Bush Construction Company for the remainder of the area.

The boundary of the project area is a line beginning at South Capitol and Eye Streets, running west to Fourth Street, north on Fourth Street, around Lots 89 and 90 in Square 541; thence further north on Fourth Street, around Lot 70 in Square 497; thence west along H Street, around Lot 43 in Square 497; thence east along G Street back to Fourth Street to the rear of lots facing on Fourth Street; thence north 95.75 feet, east 3 feet, north 16 feet, east 25 feet, north 150 feet, west 25 feet, north 61.75 feet to the south line of F Street; thence east along F Street 25 feet, north 282 feet, around Lot 16 in Square 538; thence east along E Street to the property line of the P. B. and W. railroad; thence along that boundary to South Capitol Street and to the point of beginning. From this described boundary five lots owned by the trustees of the Friendship Baptist Church were eliminated.

In an affidavit the Director of Public Health for the District of Columbia characterizes Project Area B as a slum area "characterized particularly by the lack of those things which make for a good community." Attached to his affidavit are statistics of the Bureau of Vital Statistics of the District Health Department for Census Tract No. 60, within which Project Area B lies, being about one-half the residential-commercial area in the Tract. The figures for the year 1951 are:

Appendix E to the affidavit of the Assistant Secretary of the Planning Commission) shows that the land use allocations designated in the plan are:

|  | Per Cent |
|---|---|
| Residential | 31.6 |
| First Commercial | 5.1 |
| Second Commercial | 6.7 |
| Public Uses | 15.3 |
| Expressway | 18.5 |
| Streets | 22.8 |

The plan provides for from 750 to 900 dwelling units, of which from 40 to 50 per cent are to be row houses and two-story flats and from 50 to 60 per cent are to be apartment houses. The maximum densities (that is, the number of dwelling units per net acre) are to be 25 row houses, 40 in two-story flats, and 43.5 in apartment houses. The need for accommodations is recited in the plan to be the following for different sizes of families: 30 per cent of the accommodations for families of two, 25 per cent for families of three, 20 per cent for families of four, 20 per cent for families of five, and 5 per cent for families of six or more. Accordingly it is provided that at least 60 per cent of the total dwelling units shall have two bedrooms or more and at least 20 per cent three bedrooms or more. The plan requires that not less than one-third of the dwelling units in the area shall be low-rent units, which means that the maximum rental shall be $17 per room per month, excluding utilities. The plan provides for off-street parking space and enclosed play space. It provides that the instruments of lease or sale shall include a condition that the use of the land in.

|  | Census Tract No. 60 | Entire District of Columbia |
|---|---|---|
| Death Rates Per 1000 Population | 15.6 | 10.1 |
| Death Rates from Tuberculosis Per 100,000 Population | 83.7 | 35.5 |
| Death Rates from Syphilis Per 100,000 Population | 41.8 | 7.1 |

The redevelopment plan for Project Area B (a copy of which was attached as the area shall conform to the redevelopment plan.

The full texts of the pertinent sections of the Redevelopment Act are attached as an Appendix. They can be summarized. Congress declared it to be a matter of legislative determination that, owing to technological and sociological changes, obsolete layout, and other factors, conditions existing in the District of Columbia with respect to substandard housing and blighted areas are injurious to the public health, safety, morals and welfare. It declared that control by regulatory processes has proved inadequate and insufficient. It declared that in its judgment it is necessary to acquire property by gift, purchase, or the use of eminent domain to effectuate the discontinuance of the use for human habitation of substandard dwellings and of buildings in alleys of blighted areas, and that it is necessary to modernize the planning and development of such portions of the District. Procedure under the Act is divided between two governmental agencies. The Planning Commission is directed to make a general plan for the District of Columbia which will serve as a guide of development within which various project areas may be planned. That Commission is authorized to adopt boundaries for a "project area". Such an area is defined as an appropriate unit of redevelopment planning. "Redevelopment" is defined to mean replanning, clearance, redesign and rebuilding of project areas. "Substandard housing conditions" is defined to mean conditions obtaining in connection with the existence of housing accommodations for human beings which, because of lack of sanitary facilities, ventilation or light, or because of dilapidation, overcrowding, faulty interior arrangement, or any combination of these factors, are in the opinion of the Commissioners detrimental to the safety, health, morals, or welfare of the inhabitants of the District of Columbia. The Commission is authorized to adopt a redevelopment plan for the area, which shall contain a site and use plan, specifications of standards of population density and building intensity, and, by specification of maximum rentals or otherwise, the amount or character of any low-cost housing for which the area is to be redeveloped. A project area redevelopment plan must be approved by the Commissioners of the District of Columbia. Thereafter the plan is to be certified to the Land Agency, a body of five members created for the purposes of this statute. To further the redevelopment of blighted territory and the prevention, reduction or elimination of blighting factors or causes of blight, the Agency is authorized to acquire the land in the area by purchase, gift, or eminent domain. For this purpose the Agency is authorized to bring condemnation proceedings. After the acquisition of title to the property the Agency is to transfer to the United States or the District of Columbia those pieces which are to be devoted to public uses (other than public housing), and the Agency is authorized to lease or sell the remainder of the project area to a redevelopment company or an individual or partnership, or to sell or lease parts of the area separately. While the Agency is given power to determine the terms of a lease or sale, it is required to provide that the lessee or purchaser shall carry out the approved redevelopment plan. The statute requires that, prior to approval by the District Commissioners of the redevelopment plan, they must satisfy themselves that housing is available at rents within the reach of the low-income families to be displaced from the project area. The District agencies are authorized to secure financial aid under Title 1 of the Federal Housing Act of 1949, 50 U.S.C.A.Appendix, § 1881 et seq. The Redevelopment Agency is authorized to borrow money either from the Housing Administrator or from private sources as contemplated by that statute.

The critical features of the statute are: (1) It is premised upon the phrase which is the traditional definition of the police power—public health, safety, morals and welfare. (2) Congress declared the policy of the United States to be to protect the welfare of the inhabitants of the District by eliminating conditions in-

jurious to the public health, etc. (3) Congress declared that the acquisition of real property and the leasing or sale thereof pursuant to a project area redevelopment plan is a public use. (4) The phrase "substandard housing conditions" is defined, but the phrase "blighted area" is not specifically defined. (5) For the purpose of preventing, reducing or eliminating "blighting factors or causes of blight" Congress authorized the acquisition of the title to the real estate by condemnation proceedings under the power of eminent domain. (6) Congress provided for the lease or sale of the property in a project area to private persons. (7) The uses to which the property, having been sold, could be put by the purchaser were limited, in that such uses must conform to the redevelopment plan. (8) Congress required that the District Commissioners, prior to approval of any redevelopment plan, should be satisfied that adequate housing is available to the low-income families to be displaced.

The plaintiffs say that the Redevelopment Act itself is unconstitutional on two grounds, (1) that it authorizes the taking by eminent domain of the fee title to private property and the sale or lease of that title to other private persons for private uses; and (2) that the statute authorizes the taking of property in "blighted areas" without defining that term and thus fails to establish any standard sufficiently definite to sustain the delegation of power. They also say that the statute is unconstitutional in its application to the properties of the plaintiffs, which are commercial properties; that the statute should be construed strictly and, as thus construed, does not apply to commercial property or to any property upon which slum conditions do not exist. The respondent Government agencies and officials say that the Act is constitutional, that the constitutionality of statutes similar in all substantial respects to the local statute has been sustained by the highest courts of many states and by the Supreme Court of the United States; that the elimination of slum areas, injurious to the public health, safety, morals and welfare, is a public purpose; that the condemnation of title to the property in the entire Project Area B is incidental and essential to the elimination of the slum area; that, since Congress has declared the condemnation of fee title to this property, the courts are without power to disturb that declaration; that Congress has validly delegated to the administrative agencies the power to determine the boundaries of a redevelopment area project.

■■ We can quickly dispose of the case in so far as it relates to certain parts of the property in the project area. The power to acquire by eminent domain property to be devoted to streets (including the "expressway"), schools, recreation centers, parks (including the "greenway"), and other "public uses" is established beyond question. Likewise the power to acquire by eminent domain real estate to be used for the construction of low-cost housing is established in this jurisdiction by Keyes v. United States.[2] Our problem concerns the remainder of the property in the area, which is to be acquired by eminent domain and sold or leased to private persons for private uses, with the provision that not less than one-third of the housing accommodations to be built on the property are to be for low-rent housing.

We can at once eliminate from consideration the possibility that the redevelopment plan for Project Area B is a low-rent housing project. In specifying that one-third of the dwellings be for low rent, the redevelopment plan specifically says:

"With the well-known scarcity of low-rent housing throughout the city there will undoubtedly always be tenants for this type of property. More low-rent units would be economically feasible but it was not deemed desirable to have too high a

2. 1941, 73 App.D.C. 273, 119 F.2d 444, certiorari denied, 1941, 314 U.S. 636, 62 S.Ct. 70, 86 L.Ed. 510.

proportion of one economic group concentrated in one area."

■ We also dispose at once of plaintiffs' contention that the application of the Act to commercial properties is without due process of law because not authorized by the Act. The Act applies alike to all properties which meet the conditions laid down in it. It[3] authorizes the acquisition by condemnation of "real property" for the purpose of the Act and defines "real property"[4] without differentiation between kinds.

At the beginning of our consideration we note some opinions of the United States Supreme Court which are cited to us and which have dealt with the boundaries of the power of eminent domain. The basic case is Fallbrook Irrigation District v. Bradley.[5] The case involved an irrigation act of the State of California, and the question was whether the construction of irrigation works is a public purpose. The California statute and the highest court of the State had declared it to be a public purpose. The Supreme Court of the United States held that, while the conclusions by the legislative and judicial branches of the state government are not conclusive and binding, the answer to the question frequently and largely depends upon the facts and circumstances surrounding the particular subject matter. It held that the people of California must be more familiar with such circumstances in that State than any stranger could be and that because of this familiarity the declarations of the people, legislature and courts of California must be treated with very great respect. The Court held that if irrigation of lands were not a public purpose no general scheme of irrigation could be formed or carried into effect, because without the power to take property by condemnation it would be impossible to acquire the necessary land.

The Court held that this fact, while not conclusive, was a most important consideration, because otherwise millions of acres otherwise cultivable would be left in their arid and worthless condition. Taking all the facts into consideration the Court concluded that "the irrigation of really arid lands is a public purpose."[6] The Court further held that, since the question as to what land should be subjected to irrigation was one of fact, the decision of the legislature, or its delegated agent, upon that question was, in the absence of actual fraud or bad faith, conclusive.

In Clark v. Nash[7] the Court applied the doctrine of the Fallbrook case to an irrigation project in the State of Utah, although the project, authorized by a State statute, was the condemnation of land by an individual for the purpose of irrigating his own land. The Court was careful to caution that the decision did not approve a general rule that private property might be taken in any case to promote the public interest; the decision was based upon the particular facts of the case, involving peculiarities of the use of water in the arid and mountainous states of the West and a recognition that differences in climate and soil rendered necessary different rules in different states. In Strickley v. Highland Boy Gold Mining Co.[8] the Court applied the doctrine of Clark v. Nash to the condemnation of a right-of-way by a mining corporation for an aerial bucket line across a placer mining claim. The Court held that, in view of the conditions respecting mining in the State of Utah and the findings of the State authorities upon the necessity, it would not say that those authorities were wrong, that in such unusual cases the Fourteenth Amendment did not prevent a state from requiring concessions from private individuals. In Hairston v. Danville & Western Railway

3. 60 Stat. 793 (1946), D.C.Code § 5–704 (1951).

4. 60 Stat. 792 (1946), D.C.Code § 5–702 (m) (1951).

5. 1896, 164 U.S. 112, 17 S.Ct. 56, 41 L.Ed. 369.

6. Id., 164 U.S. at page 164, 17 S.Ct. at page 65, 41 L.Ed. at page 390.

7. 1905, 198 U.S. 361, 25 S.Ct. 676, 49 L. Ed. 1085.

8. 1906, 200 U.S. 527, 26 S.Ct. 301, 50 L. Ed. 581.

Company [9] the Court applied the doctrine of the three cases we have discussed to the condemnation of land for a spur railroad track and concluded that upon the facts of the case, and certain testimony in particular, the use involved was clearly public.

Joslin Mfg. Co. v. City of Providence [10] dealt with the condemnation of land for the construction of a city water supply system, undoubtedly a public use. The opinion is pertinent here because the Court laid down the rule, citing a line of cases, that, public purpose having been established, the necessity of condemning property for that use is a legislative question and not a judicial question. In Rindge Co. v. Los Angeles County, [11] decided the same day, the Court applied the same rule, making clear, by sharply dividing the opinion, that the nature of a use, whether public or private, is ultimately a judicial question, but that the public necessity of taking particular property for that use is a legislative and not a judicial question and may be delegated by the legislature to public officials.

This brings us to Brown v. United States, [12] in which the opinion was delivered by Mr. Chief Justice Taft. The case involved the power of Congress to condemn land. The construction of a reservoir on the Snake River in Idaho resulted in the flooding of three-fourths of the town of American Falls. In order to provide a new site for the town, to which the buildings were to be removed, the Government, having purchased part of the needed property, instituted condemnation proceedings to secure the needed remainder. The action was contested on the ground that it was not for a public use of the property. The Court held that under the peculiar circumstances of the case the acquisition of the new town site was so necessary to the irrigation project that the public use, which was the reservoir, covered the taking of the town site. The Court noted that its conclusion was not in conflict with the case dealt with in the Opinion of Justices in 204 Mass. [13] In that case the justices held that the City of Boston, building an improved street, had no power to condemn lots abutting the proposed street with a view to selling them thereafter for the erection of warehouses, etc., usable in private business. The Court said that the distinction between that case and the one before it was that the removal of the town of American Falls was a necessary step in the public improvement itself. The Court said flatly that the tract selected for the new site was "the only practical and available place to which the part of the town to be flooded could be moved so as to be united with the one-quarter of the old town which would be left." [14]

In United States ex rel. T. A. v. Welch [15] the question was whether the power to condemn certain land had been conferred upon the Tennessee Valley Authority and, if so, whether the statute was constitutional. The reservoir created by the construction of a dam submerged a roadway which was the only means of ingress and egress for a mountainous area upon which some 216 families lived. After various negotiations among the State of North Carolina, the county, the T. V. A., and the National Park Service, it was determined that the most economical and most feasible solution to the difficulty was for the T. V. A. to acquire by purchase or condemnation all the land in the isolated area and to transfer it to the National Park Service for inclusion within the Great Smoky

9. 1908, 208 U.S. 598, 28 S.Ct. 331, 52 L. Ed. 637.

10. 1923, 262 U.S. 668, 43 S.Ct. 684, 67 L. Ed. 1167.

11. 1923, 262 U.S. 700, 43 S.Ct. 689, 67 L. Ed. 1186.

12. 1923, 263 U.S. 78, 44 S.Ct. 92, 68 L.Ed. 171.

13. 1910, 204 Mass. 607, 91 N.E. 405, 27 L. R.A.,N.S., 483.

14. Supra, 263 U.S. at page 81, 44 S.Ct. at page 93.

15. 1946, 327 U.S. 546, 66 S.Ct. 715, 718, 90 L.Ed. 843.

Mountain National Park. The District Court and the Court of Appeals held that the T. V. A. had no power under the statute to condemn this land. The Supreme Court reversed. The Court said that it viewed the entire transaction, that is, the construction of the dam, the reservoir, and the acquisition of the property, as a single integrated effort. It held that the responsibilities placed on the T. V. A. were not only the building of dams but related to navigability, flood control, reforestation, marginal lands, and the agricultural and industrial development of the whole Tennessee Valley. The Court discussed the scope of the judicial power to determine what is a public use for the purposes of the Fourteenth Amendment and quoted from Old Dominion Land Co. v. United States,[16] saying that whatever may be the scope of that power the decision of Congress "is entitled to deference until it is shown to involve an impossibility." The Court held that the T. V. A. took the tracts for a public purpose. The cited case, Old Dominion Land Co. v. United States, involved the condemnation of land upon which the United States had built warehouses for the Quartermaster of the Army at a cost of more than $1,500,000, which the Court said "clearly were for a public use." Congress had made a specific appropriation for this land, labeling it "Sites for military purposes" and "for the quartermaster warehouses". A contention was made that the Secretary of War and his subordinates had in mind saving to the Government the cost of the buildings rather than a future use of the land by the Government. In that connection the Court said that the decision of Congress "is entitled to deference until it is shown to involve an impossibility."

We come, then, to the problem presented in the case at bar. It lies in three parts. 1. First, there is the slum. A slum is made up of houses (or substitutes for houses), the appurtenances thereto, and people. The houses and appurtenances are such that the people live in filth and breed disease and crime. A slum can be eliminated by tearing down the houses, destroying the appurtenances, and either building new housing on the spot for the people or moving the people away. 2. Second, there is the land upon which a slum exists. The land itself neither contributes to nor detracts from a slum. It is the same whether a slum or a model building exists upon it. The land cannot be destroyed or moved. Only its ownership and its use can be changed. If cleared, the land upon which a slum presently exists would have no harmful effects upon the public. Neither does naked ownership of land, apart from use, have any harmful public effects. A slum and the legal title to the naked land upon which it exists are separate things. 3. Third, there are sections of cities which are not at the present time used to their fullest economic possibility, or are not arranged to fit current ideas of city development. An outstanding example is Trinity Church and its surrounding cemetery at the corner of Wall Street and Broadway in New York City. Old streets are not so wide as new ones would be. Apartment houses would be more economically efficient than are single dwellings. Phrases used to describe this situation [17] are "inadequate planning of the area", "excessive land coverage by the buildings thereon", "defective design and arrangement of the buildings thereon", "faulty street or lot layout", "economically or socially undesirable land uses". The statutes dealing with these areas are usually called "urban redevelopment" laws. The areas are frequently called "blighted". They are in no sense slums, or similar to slums; they are out-of-date. They do not breed disease or crime; they fail to measure up to their maximum potential use in terms of economic, social, architectural, or civic desirability.

16. 1925, 269 U.S. 55, 66, 46 S.Ct. 39, 40, 70 L.Ed. 162.

17. Taken from the Pennsylvania statute. Urban Redevelopment Law of May 24, 1945, P.L. 991, 35 P.S. § 1701 et seq.

These three distinct factual situations present three distinct sets of legal questions.

## I

First, we have the problem of the slum. There is no doubt concerning the power of Congress to delegate to the District Government the power to clear slums. The power lies within the well-established concepts of police power, which is the protection of the public health, safety, morals and welfare. And the Supreme Court pointed out in District of Columbia v. John R. Thompson Co.[18] that the Congress can delegate the full of the police power to the District Government. Moreover, the clearance of a slum is a public purpose, and the condemnation of improvements upon land— buildings and appurtenances—which create the hazards to health, safety, etc., is within the power of eminent domain. Since the Government can condemn such property without compensation under the police power, *a fortiori* it can condemn and pay reasonable compensation. Since there is power to condemn without compensation there is power to condemn with compensation.

There have been in existence for years statutes which give the District Government condemnation power in respect to unsafe and insanitary buildings and in respect to alley dwellings.[19] If they are not sufficient to complete the advisable eliminations, Congress has ample power to correct the deficiencies.

We hold, therefore, that, so far as the District Redevelopment Act authorizes the condemnation of improvements upon land which are the creating or perpetuating causes of conditions injurious to the public health, safety, morals and welfare, as that term is used to describe breeding grounds for crime and disease, it is valid.

The problem of the slum includes not only the elimination of presently existing slums but also the prevention of future slums. That objective involves questions different from and more difficult than the elimination of present conditions. Prevention deals with developments which may occur in the future, not merely with conditions which exist in the present. So the problem of prevention is: What should be done with property to prevent future developments which will eventuate in slums? Regulations affecting the use of property, designed to prevent the breeding and spread of disease and crime, are within the police power and, when reasonable, are clearly valid. And it seems to us that the prevention of such conditions is a public purpose which would sustain the validity of seizure by eminent domain where the seizure is necessary for the purpose. But that conclusion poses problems. Among these problems are: Is the seizure *necessary* to the prevention of slums? Does the proposed disposition of the property after seizure reasonably serve the purpose of prevention? Perhaps the problem is more vividly phrased this way: If no slum exists, either because none has ever existed at that place or because an existing slum has been cleared, may the Government seize property in order to prevent the future development of a slum? Practical questions are immediately obvious. Why is such a drastic step by the Government necessary or appropriate to prevent a future slum on a certain parcel of land? Will the proposed disposition of the property prevent slum conditions from occurring on it? The buildings, appurtenances, etc., which constitute the slum itself are usually simply destroyed. The puzzling questions relating to slum prevention, therefore, relate more directly to the title to the land than they do to the ownership of the improvements. We therefore discuss the matter in more detail in the next section of this opinion.

## II

Second, we have the problem of the title to the land upon which a slum now

---

18. 1953, 346 U.S. 100, 73 S.Ct. 1007, 97 L.Ed. 1480.

19. D.C.Code, §§ 103–104, 501–504, 601–607 of Title 5 (1951).

exists. Can the Government seize title to land from which a slum has been or could be cleared, and sell it to a private person for private uses? If the land is to be devoted to schools, roads, parks and such, or to public housing, or to needed low-cost housing, it is to be devoted to a public use, and so its seizure under the power of eminent domain is clearly authorized. But, if the sale subsequent to the seizure is to a private person for a purely private use—such, for example, as apartment houses, stores or theaters—the validity of the seizure of the title is a different problem.

The traditional definition of the power of eminent domain is in terms of public use. It contemplates the use to which the property is to be put after it has been taken. Illustrations are those we have just mentioned, the taking of property for schools, streets, parks, etc. But the term "public use" has progressed as economic facts have progressed, and so projects such as railroads, public power plants, the operation of mines under some conditions, and, more recently, low-cost housing have been held to be public uses for which private property may be seized. Moreover, the traditional concept of use as the keystone of eminent domain has been enlarged in modern thought and cases. We find it described as public purpose. The variation in the term from "use" to "purpose" indicates a progression in thought. The idea is that the taking itself, as distinguished from the subsequent use of the property, may be required in the public interest. The Supreme Court has not gone far in that direction, but we think we see it indicated in the Brown and T. V. A. cases, which we have discussed. We so hold. We hold that the taking of title to real estate for the public purpose of eliminating or of preventing slums is within the power of eminent domain, even though the use to which the property is put after seizure is not a public use; provided (1) that the seizure of the title is necessary to the elimination of the slum or (2) that the proposed disposition of the title may reasonably be expected to prevent the otherwise probable development of a slum.

These extensions of the concept of eminent domain, to encompass public purpose apart from public use, are potentially dangerous to basic principles of our system of government. And it behooves the courts to be alert lest currently attractive projects impinge upon fundamental rights. The reasoning upon the point begins with the basic concept of natural rights and of property as one of those rights. To secure those rights governments were instituted, says the Declaration, and to secure them governments may impose limitations upon them; moreover, by clear implication the Fifth Amendment authorizes the taking of private property for public use. But here is the end of government power. That the Government may do whatever it deems to be for the good of the people is not a principle of our system of government. Nor can it be, because the ultimate basic essential in our system is that individuals have inherent rights, and as to them the powers of government are sharply limited. There is no general power in government, in the American concept, to seize private property. Hence it is universally held [20] that the taking of private property of one person for the private use of another violates the due process of law clauses of the Fifth and Fourteenth Amendments. The reasoning which applies to this right is the same as that which applies to other rights guaranteed by the Constitution. Congress can suppress free speech if a clear and present danger necessitates it, but the suppression can go only as far as the necessity. In these

20. A chain of study could begin with Missouri Pacific Ry. Co. v. State of Nebraska ex rel. Board of Transportation, 1896, 164 U.S. 403, 417, 17 S.Ct. 130, 41 L.Ed. 489, 495. Many treatises have been written upon it. See, e.g., Cooley, Constitutional Limitations 1124 et seq. (8th ed. 1927); Mott, Due Process of Law, pt. 9, c. 21 (1926); 1 Nichols, Eminent Domain § 4.7 et seq. (3d ed. 1950).

principles lies one of the critical differences between our system of government and the totalitarian systems.

█ The restriction of the power of seizure to the necessities of the public use or purpose is clearly taught by the Supreme Court in Brown v. United States, supra. As we have already pointed out, the Court explicitly noted that its decision was not in conflict with the Massachusetts case [21] in which the justices held that, while the power of eminent domain permitted the seizure of property necessary to widen a street, it did not permit the seizure of abutting property for the purpose of reselling it for private uses. Mr. Justice Brandeis said in Thompson v. Consolidated Gas Utilities Corp.,[22] "And this Court has many times warned that one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid."[23] We do not understand the T. V. A. case, supra, to repudiate this principle. Rather it affirmed it. The Court, after examining the facts and the statute, held the taking to be for a public purpose; it did not hold that T. V. A. might seize property beyond the public need. "When the need arises," said the Court, "individuals may be required to relinquish ownership of property * * *."[24]

The rule is laid down in Pennsylvania Mut. Life Ins. Co. v. City of Philadelphia,[25] decided by the Supreme Court of Pennsylvania and cited with approval by that court in Belovsky v. Redevelopment Authority.[26] It held invalid an act authorizing the seizure and resale of property abutting a public park merely for the purpose of protecting the parkways and "the preservation of the view, appearance, light, air, health, or usefulness thereof." 53 P.S. § 1554.

In the Muller case [27] the Court of Appeals of New York said:

"Whenever there arises, in the state, a condition of affairs holding a substantial menace to the public health, safety, or general welfare, it becomes the duty of the government to apply whatever power is necessary and appropriate to check it. There are differences in the nature and characteristics of the powers, though distinction between them is often fine. * * * But if the menace is serious enough to the public to warrant public action and the power applied is reasonably and fairly calculated to check it, and bears a reasonable relation to the evil, it seems to be constitutionally immaterial whether one or another of the sovereign powers is employed."

█ We are of opinion that title to real estate cannot be seized by the Government merely because a slum presently exists upon the land. Some further necessitous circumstance must exist to validate such a seizure. It must be either that the clearance of the slum is impracticable without taking the title to the land or that proposed restrictions which can be imposed only through the medium of a resale are fairly calculated to prevent recurrence of slum conditions. Ordinarily the seizure of the fee title to land would seem to be neither necessary nor reasonably incidental to the clearance of a slum. But we readily see that there could be circumstances—such, for example, as an obdurate landlord or an impoverished homeowner—in which the

21. Opinion of Justices, supra note 13.

22. 1937, 300 U.S. 55, 80, 57 S.Ct. 364, 376, 81 L.Ed. 510.

23. And see Kohl v. United States, 1876, 91 U.S. 367, 23 L.Ed. 449; City of Cincinnati v. Vester, 1930, 281 U.S. 439, 50 S.Ct. 360, 74 L.Ed. 950; Salisbury Land & Improvement Co. v. Commonwealth, 1913, 215 Mass. 371, 102 N.E. 619, 46 L.R.A.,N.S., 1196.

24. Supra, 327 U.S. at pages 554–555, 66 S.Ct. at page 719.

25. 1913, 242 Pa. 47, 88 A. 904, 905, 49 L. R.A.,N.S., 1062.

26. 1947, 357 Pa. 329, 54 A.2d 277, 172 A.L.R. 953.

27. New York City Housing Authority v. Muller, 1936, 270 N.Y. 333, 1 N.E.2d 153, 155, 105 A.L.R. 905.

seizure of the title, with compensation therefor, ought in reason accompany the condemnation of the buildings. Valid seizure for prevention purposes frequently occurs when the changing of a neighborhood from residential to manufacturing, maritime, or major commercial leaves a remnant of housing accommodations which nurture slum conditions and which ought to be removed to permit other uses.[28]

Whether the taking of a certain piece of property is necessary for a certain public use or purpose is initially and almost wholly a legislative question. But like every other legislative determination it is subject to the Constitution. Congress itself could not deprive a person of his property without due process of law. It is the duty of the courts, when a legislative act is challenged as violative of the Constitution, to determine that issue. Indeed it is for that specific purpose that this three-judge court is assembled by direct and specific authorization of Congress. Judicial consideration of the validity of a legislative decision that a particular property be seized for a public purpose is not farther removed from judicial inquiry than is the validity of a statute. As Mr. Justice Burton pointed out in United States v. Carmack,[29] the Fifth Amendment provides an owner "with important protection against abuse of the power of eminent domain".

Just as the seizure of property by the Government is a legislative rather than a judicial question it is also a legislative rather than an executive question. The Supreme Court made amply clear in Youngstown Sheet & Tube Co. v. Sawyer [30] that, unless there is an act of Congress which expressly authorizes seizure or from which authority to seize can fairly be implied, there is no executive power of seizure. That rule must guide us here.

In the case before us Congress made no declaration concerning the specific property involved. Its declaration concerned "conditions existing in the District of Columbia with respect to substandard housing and blighted areas". Obviously that declaration did not concern all conditions everywhere in the District. It meant certain conditions in certain places. Congress declared as a matter of legislative determination that the conditions to which it referred "are injurious to the public health, safety, morals, and welfare". Here, then, in that quoted expression is the description of the conditions to which the statute is directed. Then Congress declared that to effectuate its policy of "eliminating all such injurious conditions" and "to eliminate the substandard housing conditions and the communities in the inhabited alleys and blighted areas" acquisition of property by eminent domain is necessary. When it conferred the power of eminent domain upon the Agency it did so subject to the "conditions" of the Act and "for that purpose", i. e., for the redevelopment of "blighted territory" and the prevention and elimination of "blighting factors or causes of blight".

With those limitations Congress delegated to executive officials the authority to determine what properties should be seized. Of course it could do so, provided the required tests, established long ago, are met. The tests are: The purpose for which the property is to be seized must be a public purpose; the seizure must be for the declared purpose; and the act of delegation must be sufficiently explicit to enable the administrators to act with administrative power and not impinge upon legislative power, and also to enable a court to determine whether the administrators are within the congressional grant.

With these principles in mind we hold that the seizure of title to real estate upon which slums exist or upon which a slum may be foreseen would be valid under the Constitution only to

---

28. See, e. g., Burt v. City of Pittsburgh, Schenck v. City of Pittsburgh, and Foeller v. Housing Authority of Portland, infra.

29. 1946, 329 U.S. 230, 236–237, 67 S.Ct. 252, 255, 91 L.Ed. 209.

30. 1952, 343 U.S. 579, 72 S.Ct. 863, 96 L. Ed. 1153.

the extent that the taking is reasonably necessary to the accomplishment of the asserted public purpose. We hold that the Redevelopment Act goes no further than that, that it confers upon the administrative officials power to seize property, under the limitations we have described, only for the purpose of eliminating or preventing conditions injurious to the public health, safety, morals or welfare. Thus construed, we hold the statute to be valid. We hold that the necessity for the seizure of the title to a parcel of real estate involves facts and judgment, that these are essentially for the administrators, and that the function of the courts is limited to determining whether the conclusions of the administrators are within reason upon the record and within the congressional delegation of authority.

### III

Third, we have the problem of the area which is not a slum but which is out-of-date, called by the Government "blighted" or "deteriorated". The Government says the statute is not limited to slum clearance but extends to what is called "urban redevelopment"; and that as thus construed the statute is valid. The word in the statute upon which the Government rests its view is "blighted", which is not defined in the statute. A hint of a meaning such as that urged by the Government is found in the phrase "backward and stagnant and therefore blighted", which appears near the end of Section 3(n) of the Act. But we have already indicated our conclusion that the more direct provisions of the statute control its scope, that it is the clearly expressed intent of the Congress to authorize in this statute the seizure of property only for the purpose of eliminating and preventing thereafter conditions injurious to the public health, safety, morals and welfare. If we did not find this meaning clear upon the face of the statute, we would be impelled to construe it with that meaning, because otherwise the statute would be unconstitutional.

The contention as to "blight" and "urban redevelopment" would cover two possible factual situations: one where the plan is to redevelop an area in which no slums exist, and the other where the plan is to redevelop an area which the Government deems "appropriate" for redevelopment but upon only a part of which slums exist. We first discuss the two possibilities separately.

The hypothesis in the first phase of this consideration is an urban area which does not breed disease or crime, is not a slum. Its fault is that it fails to meet what are called modern standards. Let us suppose that it is backward, stagnant, not properly laid out, economically Eighteenth Century—anything except detrimental to health, safety or morals. Suppose its owners and occupants like it that way. Suppose they are old-fashioned, prefer single-family dwellings, like small flower gardens, believe that a plot of ground is the place to rear children, prefer fresh to conditioned air, sun to fluorescent light. In many circles all such views are considered "backward and stagnant". Are those who hold them "therefore blighted"? Can they not, nevertheless, own property? Choice of antiques is a right of property. Or suppose these people own these homes and can afford none more modern. The poor are entitled to own what they can afford. The slow, the old, the small in ambition, the devotee of the outmoded have no less right to property than have the quick, the young, the aggressive, and the modernistic or futuristic.

Is a modern apartment house a better breeder of men than is the detached or row house? Is the local corner grocer a less desirable community asset than the absentee stockholder in the national chain or the wage-paid manager? Are such questions as these to be decided by the Government? And, if the decisions be adverse to the erstwhile owners and occupants, is their entire right to own the property thereby destroyed? Even if the line between regulation and seizure, between the power to regulate and the

power to seize, is not always etched deeply, it is there. And, even if we progress in our concepts of the "general welfare", we are not at liberty to obliterate the boundary of governmental power fixed by the Constitution.

The terms "public use" and "public purpose" have never been defined with precision, and cannot be. Localities, customs and times change, and with them the needs of the public may change. But even the most liberal courts have put boundaries upon the meanings. One eminent authority [31] sums up the matter by saying that the courts which go furthest in sustaining the power of eminent domain hold that "anything which tends to enlarge the resources, increase the industrial energies, and promote the productive power of any considerable number of the inhabitants of a section of the state, or which leads to the growth of towns and the creation of new resources for the employment of capital and labor" constitutes a public use. We think so unqualified a definition cannot be sustained, because every factory or mercantile house of any size meets that definition to some degree, and most certainly the Government has not an unrestricted power to seize one man's property and sell it to another for the building of a factory or a store. The decisions of the courts which used such sweeping language and which are cited to us fall far short of supporting the contention made to us in the present case. We shall discuss them in a moment.

It is said that the established meaning of eminent domain includes measures for the "general welfare" and that new social doctrines have so enlarged the concept of public welfare as to include all measures designed for the public benefit. The difficulty lies somewhat in the unqualified philosophical declaration, but it lies more in the practicality that some person or persons must determine, if that be the rule, what is the public benefit. Therein lies the insuperable obstacle, in the American view. There is no more subtle means of transforming the basic concepts of our government, of shifting from the preeminence of individual rights to the preeminence of government wishes, than is afforded by redefinition of "general welfare", as that term is used to define the Government's power of seizure. If it were to be determined that it includes whatever a commission, authorized by the Congress and appointed by the President, determines to be in the interest of "sound development", without definition of "sound development", the ascendancy of government over the individual right to property will be complete. Such ascendancy would logically follow over the rights of free speech and press, it seems to us.

We are of opinion that the Congress, in legislating for the District of Columbia, has no power to authorize the seizure by eminent domain of property for the sole purpose of redeveloping the area according to its, or its agents', judgment of what a well-developed, well-balanced neighborhood would be; lest this sentence be misconstrued out of context, we repeat our hypothetical assumption for the purposes of this first phase of Section III of our opinion that no slum exists on the hypothetical property or in the area and that the seizure is not for a public use.

But the Government rests the present case upon a narrower basis. And this brings us to the second phase of the problem posed in this section of the opinion. This concerns a situation where the plan is to redevelop an area upon only a part of which slums exist. The state cases hold, the Government says, that "where from a comprehensive standpoint there is a *public benefit,* such as slum clearance, flowing from the project, the taking is for a public use regardless of the ultimate disposition of the particular piece of property." The Government says that it has determined that Project Area B in the case at bar is an appropriate area for "redevelopment", that slums exist in that area, and that therefore it

---

31. 2 Nichols, Eminent Domain § 7.2 et seq. (3d ed. 1950).

may seize the title to all the land in the area and, having replanned it, sell it to private persons for the building of row houses, apartment houses, commercial establishments, etc. In essence the claim is that if slums exist the Government may seize, redevelop and sell all the property in any area it may select as appropriate, so long as the area includes the slum area. This amounts to a claim on the part of the authorities for unreviewable power to seize and sell whole sections of the city.

■ We think, as we have indicated, that the Redevelopment Act does not contain so broad an authorization. But, if it did so, it would be invalid from two viewpoints. In the first place, a public purpose must be the reason for the seizure of private property, not merely the excuse for the seizure. There must be a necessity for the taking in order to accomplish the public purpose. The rule governing the seizure of property geographically unnecessary to slum clearance is the same as that governing the unnecessary seizure of title to land upon which a slum exists, which rule we have already discussed. In the second place, the Redevelopment Act does not contain standards sufficiently definite to sustain the validity of an authorization as broad as that claimed. "Blight" is not defined in the statute. No standard other than "substandard housing" is defined. We are not told where we may ascertain what a proper land coverage would be, or a building arrangement without defect, or a street layout without fault, or what is desirable economic use or even socially desirable use of land, or what is "backward" or "stagnant", or what is "sound development". These criteria for seizure would be formulated on a case-by-case basis.

The inadequacy of the statutory prescriptions is demonstrated by the proposed boundary lines of Project Area B. We have in the statute no measuring means by which to tell why one property on Fourth Street is to be seized, or can be seized validly, while another property on the same side of the same block, or across the street, or in the next block is not included in the area to be condemned. Congress cannot confer undescribed authority to regulate a business; *a fortiori* it cannot confer undefined power to seize in full ownership businesses and properties.

The Government cites the recent redevelopment cases in the state and federal courts. The state cases are far too numerous to discuss in detail, but study shows that they deal with low-cost housing projects, with solutions for acute conditions affecting some major feature of the life of the city, or with slum clearance alone. The Foeller case [32] is an example of an exhaustive study, with many citations of authority. It involved an area in the waterfront district of Portland, Oregon, where dwellings remained scattered among the commercial and industrial establishments as those establishments increased in number and the residential areas retreated from them. This inevitably created slums. Moreover, if the old houses were removed and new ones built in the same locations, slum conditions would almost certainly return. Housing accommodations in the midst of the smoke, fumes, noise, and fire hazards of maritime and industrial activity naturally and usually retrogress to slums. At the same time, commercial, industrial and maritime activity is the lifeblood of Portland. The redevelopment plan was to take over the titles to these dwellings and the small neighborhood business properties and to resell them with provisions, inserted in the title instruments to run with the land, that the property be used thereafter for commercial and industrial purposes only. Here was a vigorous, somewhat drastic attack upon an acute public problem. The seizure and resale of the properties, grouped to permit use for other than dwellings, was a clear method of serving two purposes, (1) to prevent the recreation of slums and (2) to enlarge the potential activity upon which the city lived. The Supreme Court of Oregon, in an exhaustive opinion,

32. Foeller v. Housing Authority of Portland, Or.1953, 256 P.2d 752.

stressing and emphasizing the features of the factual situation, upheld the statute.

The same sort of condition existed in the Schenck case.[33] The project area was the heart of the downtown commercial area of Pittsburgh. The growth of the city from a small town on the triangle between the two rivers left village streets to serve the needs of a great commercial metropolis, and dwellings remained in the district. Inevitably slums arose in those dwelling conditions. The proposed redevelopment plan was to take those properties, build a great park, replat the streets, and erect three 18-story office buildings. Here again were two purposes, the conclusive prevention of a return of slums to this area and the enlargement of the activity upon which the economic life of the public depended. The Supreme Court of Pennsylvania upheld the plan, and the federal courts did likewise.

In Zurn v. City of Chicago[34] a different problem was presented. The statute there involved, the Supreme Court of Illinois said, "is purely an act for slum clearance and rehabilitation of slum and blight areas", and again it said, "The sole basis for the public use is slum clearance and the rehabilitation of slum and blight areas." The court noted that "Slum and blight areas are defined in section 3 as those urban districts in which a major portion of the housing is detrimental to the health, safety, morality or welfare of the occupants by reason of age, dilapidation, overcrowding, faulty arrangement, lack of ventilation, light or sanitation facilities, or any combination of these factors."[35] Within this purpose of slum clearance the court upheld the power of eminent domain.

It is said that the Supreme Court in Burt v. City of Pittsburgh[36] sustained the view which the Government takes upon this phase of the matter before us. But we do not find that conclusion in that case. That controversy concerned the same problem, the same area in downtown Pittsburgh, that was considered in Schenck, supra. It was presented to a three-judge federal court, and that court, in a two-paragraph opinion,[37] recited (1) that the validity of the statute[38] under the constitution of the State of Pennsylvania had been upheld by the Supreme Court of Pennsylvania in two cases, citing Schenck and the Belovsky case,[39] and (2) that there was nothing in the complaint or in the exhibits attached thereto which indicated that the statutes themselves or the action of the constituted authorities in carrying them out violated the plaintiff's rights under the federal Constitution. Thereupon the court dismissed the complaint. The Supreme Court affirmed upon motion, without opinion, citing United States ex rel. T. V. A. v. Welch, supra. In the latter case the Court had pointed out that it had never held invalid a state statute authorizing the taking of private property for public uses which the supreme court of the state had upheld. It must be this section of the T. V. A. opinion which the Court had in mind in citing the case in the Burt case, since the remainder of that opinion dealt with the constitutional powers of a federal agency under a federal statute.

In the Belovsky case, cited by the three-judge court in Burt, the Supreme Court of Pennsylvania held that the fundamental purpose of the Housing Authorities Act, which it had upheld as a slum clearance act,[40] and the Urban Rede-

33. Schenck v. City of Pittsburgh, 1950, 364 Pa. 31, 70 A.2d 612.

34. 1945, 389 Ill. 114, 59 N.E.2d 18.

35. Id., 59 N.E.2d at page 23.

36. 1950, 340 U.S. 802, 71 S.Ct. 53, 95 L. Ed. 589.

37. Burt v. Pittsburgh, Civ.No.8706, D.C. W.D.Pa., April 25, 1950.

38. Urban Redevelopment Law, supra note 17.

39. Belovsky v. Redevelopment Authority, 1947, 357 Pa. 329, 54 A.2d 277.

40. Dornan v. Philadelphia Housing Authority, 1938, 331 Pa. 209, 200 A. 834.

velopment Law "was the same, namely, the clearance of slum areas",[41] and that in the Urban Redevelopment Law there was "only the one major purpose of the elimination and rehabilitation of the blighted sections".[42] The court pointed out that "the law actually requires that property be taken by eminent domain only to the extent reasonably required for the purpose for which the power is exercised".[43]

Thus the utmost held by the recent redevelopment cases is that meeting a compelling community economic need is a public purpose. That is the doctrine of the early Supreme Court cases, such as Fallbrook, Clark v. Nash, and others, supra. We do not depart from the thesis of those decisions.

In people of Puerto Rico v. Eastern Sugar Associates[44] the Court of Appeals for the First Circuit considered a statute of the insular legislature which embodied a far-reaching program of agrarian reform designed to remedy desperate economic conditions existing in the Islands. The act authorized the seizure of large holdings of land used for the raising of sugar, especially that owned by corporations, and the redistribution of the land to individuals in small parcels. The court based the validity of the statute upon the public necessity for solution of the general and acute conditions and upon its conclusion that the statute was "reasonably calculated to deal with these problems." The essence of the opinion conforms to the other decisions we have discussed.

The Government cites cases dealing with such problems as the selection of post-office sites,[45] and the authority of administrative officials to make such selections. They are not pertinent here. The United States has undoubted power to establish post offices, and the use is a public use. The site merely involves a comparative judgment. The question before us concerns power.

Legal support for the Government's position is sought in the authorities upholding the validity of zoning. But we know of no zoning law which provides that, if one's property, now to be in a residential zone, has been used in the past for commercial purposes, its ownership is forfeit. Moreover the power to zone is sharply restricted. The Supreme Court said in Nectow v. City of Cambridge,[46] cited in Devereux Foundation v. Lea:[47]

"The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, and other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare. [Village of] Euclid [Ohio] v. Ambler [Realty] Co., supra [272 U.S. 365], p. 395 [47 S.Ct. 114, 71 L.Ed. 303]."

And in State of Washington ex rel. Seattle Title Trust Co. v. Roberge[48] the Court said: "Zoning measures must find their justification in the police power exerted in the interest of the public."

This brings us to consider the redevelopment plan before us. It covers about fifteen square city blocks. It lies within a Census Tract in which slum conditions are said to exist, and it contains properties upon which slum conditions are said to exist. Its western boundary is an irregular line which runs around lots, encompasses some establishments along a street and excludes others on the same side of the same street, moves from

41. Supra, 54 A.2d at page 281.

42. Id., 54 A.2d at page 282.

43. Id., 54 A.2d at page 283.

44. 1946, 156 F.2d 316, certiorari denied 1946, 329 U.S. 772, 67 S.Ct. 190, 91 L.Ed. 664.

45. E.g., United States v. Carmack, supra.

46. 1928, 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842.

47. 1945, 326 U.S. 686, 66 S.Ct. 89, 90 L.Ed. 403.

48. 1928, 278 U.S. 116, 120–121, 49 S.Ct. 50, 51, 73 L.Ed. 210.

east to west as it runs north. It excludes certain properties, and under it certain other properties would be sold back to the present owners or be retained by them. The key to the plan, apart from slum clearance, is the opinion of the Government authorities that residential neighborhoods should be "well-balanced" and that the area should contain housing for all income groups. The plan points out that "redevelopment" will inevitably raise the average income level and make it possible to introduce housing for higher-income families at a later stage in the program. It says that generally the Southwest area "should be predominantly a moderate to lower-income area". The recommendations as to the percentages of the types of accommodations to be built in the area are said to be "based upon a conservative analysis of the present local real estate market." The plan says: "The purpose of redevelopment is to clear the slums and replace them with that pattern of land use most appropriate to the overall development of the community."

No acute housing shortage is to be met. In fact the plan provides for no more residents than presently occupy the area. No pressing economic condition, apart from the slums, is sought to be dealt with by this plan. No purpose of housing for the needy—low-rent housing—is the motivation. No rearrangement of streets is contemplated or provided. The streets throughout Project Area B are exactly the same as are the streets in all parts of the District of Columbia, lettered streets running east and west and numbered streets running north and south, in continuous lines across the entire District. The plan provides that certain streets shall be widened somewhat and that an expressway and a greenway shall be built. The only restrictions as to future use are the requirements as to the type of houses to be built (row, apartment, etc.) and as to the percentage of rentals for the low-income group.

In sum the purpose of the plan, in addition to the elimination of slum conditions, is to create a pleasant neighborhood, in which people in well-balanced proportions as to income may live. The Government is to determine what conditions are pleasant, what constitutes the "most appropriate" pattern of land use, what is a good balance of income groups for a neighborhood, how many poor people, how many moderately well-to-do people, how many families of two, how many of four, etc., should be provided for in this neighborhood, and what the proper development of a community should be.

Of course the plan as pictured in the prospectus is attractive. In all probability it would enhance the beauty and the livability of the area. If undertaken by private persons the project would be most laudable. It would be difficult to think of a village, town or city in the United States which a group of artists, architects and builders could not improve vastly if they could tear down the whole community and rebuild the whole of it. But as yet the courts have not come to call such pleasant accomplishments a public purpose which validates Government seizure of private property. The claim of Government power for such purposes runs squarely into the right of the individual to own property and to use it as he pleases. Absent impingement upon rights of others, and absent public use or compelling public necessity for the property, the individual's right is superior to all rights of the Government and is impregnable to the efforts of government to seize it. That the individual is in a low-income group or in a high-income group or falls in the middle of the groups is wholly immaterial. One man's land cannot be seized by the Government and sold to another man merely in order that the purchaser may build upon it a better house or a house which better meets the Government's idea of what is appropriate or well-designed.

We hold that Congress did not in the Redevelopment Act confer power to seize property beyond the reasonable necessities of slum clearance and

prevention, the word "slum" meaning conditions injurious to the public health, safety, morals and welfare.

■ If property is seized for the purpose of eliminating or preventing slums within the limitations and in accordance with the rules we have described, the fact that it may be sold subsequently to private persons does not vitiate the validity of the seizure.

The complaints in the two actions at bar are pitched entirely upon a challenge of the constitutionality of the Redevelopment Act, and, except the issue as to commercial property, no other issue as to the application of the statute to the property of plaintiffs is raised by the pleadings. Therefore, since the statute, as we construe it, is constitutional, we must grant the motion to dismiss.

In the argument by plaintiffs' counsel in support of their motions for summary judgment, reference was made to arbitrary and capricious action by the Planning Commission in fixing the boundary lines of the Southwest Redevelopment Project Area "B" to include the plaintiffs' commercial properties, while excluding other commercial properties on the same street. This issue, however, is not raised by the pleadings. Should the pleadings be amended to include an issue as to whether or not the administrative agency has acted beyond the scope of the statute, as construed in this opinion, in including the plaintiffs' properties within the project area, the case should be heard by one judge for determination of that question.

### Appendix

60 Stat. 790 (1946), D.C.Code § 5–701 (1951):

"It is hereby declared to be a matter of legislative determination that owing to technological and sociological changes, obsolete lay-out, and other factors, conditions existing in the District of Columbia with respect to substandard housing and blighted areas, including the use of buildings in alleys as dwellings for human habitation, are injurious to the public health, safety, morals, and welfare, and it is hereby declared to be the policy of the United States to protect and promote the welfare of the inhabitants of the seat of the Government by eliminating all such injurious conditions by employing all means necessary and appropriate for the purpose; and control by regulatory processes having proved inadequate and insufficient to remedy the evils, it is in the judgment of Congress necessary to acquire property in the District of Columbia by gift, purchase, or the use of eminent domain to effectuate the declared policy by the discontinuance of the use for human habitation in the District of Columbia of substandard dwellings and of buildings in alleys and blighted areas, and thereby to eliminate the substandard housing conditions and the communities in the inhabited alleys and blighted areas in such District; and it is necessary to modernize the planning and development of such portions of such District. The Congress finds that the foregoing cannot be accomplished by the ordinary operations of private enterprise alone without public participation in the planning and in the financing of land assembly for such development; and that for the economic soundness of this redevelopment and the accomplishment of the necessary social and economic benefits, and by reason of the close relationships between the development and uses of any part of an urban area with the development and uses of all other parts the sound replanning and redevelopment of an obsolescent or obsolescing portion of such District cannot be accomplished unless it be done in the light of comprehensive and coordinated planning of the whole of the territory of the District of Columbia and its environs; and that this comprehensive planning and replanning should proceed vigorously without delay; and to these ends it is nec-

essary to enact the provisions hereinafter set forth; and that the acquisition and the assembly of real property and the leasing or sale thereof for redevelopment pursuant to a project area redevelopment plan, all as provided in sections 5–701 to 5–719, is hereby declared to be a public use."

60 Stat. 791 (1946), D.C.Code § 5–702 (1951):

"The following terms, whenever used or referred to in sections 5–701 to 5–719, shall, for the purposes of sections 5–701 to 5–719 and unless a different intent clearly appears from the context, be construed as follows:

*   *   *   *   *   *

"(f) 'Low-rent housing' means safe and sanitary housing within the financial reach of families of comparatively low income and, as a guide for the standard of rental to be used as a maximum at the time of the enactment of this law but not necessarily thereafter, it is specified that such housing shall be rented at not more than $13 per room per month, excluding utilities.

*   *   *   *   *   *

"(h) 'Planning Commission' means the National Capital Park and Planning Commission.

*   *   *   *   *   *

"(j) 'Project area' is an area of such extent and location as may be adopted by the Planning Commission and approved by the District Commissioners after public hearing as an appropriate unit of redevelopment planning for a redevelopment project separate from the redevelopment projects for other parts of the District of Columbia. In the provisions of this Act relating to lease or sale by the Agency, for abbreviation 'project area' is used for the remainder of the project area after taking out those pieces of property which in accordance with section 7–706(a) shall have

been or are to be transferred for public uses.

*   *   *   *   *   *

"(n) 'Redevelopment' means replanning, clearance, redesign, and rebuilding of project areas, including open-space types of uses, such as streets, recreation and other public grounds, and spaces around buildings, as well as buildings, structures, and improvements, but not excluding the continuance of some of the existing buildings or uses in a project area. For the purposes of sections 5–701 to 5–719, 'redevelopment' also includes the replanning, redesign, and original development of undeveloped areas which, by reason of street lay-out, lot lay-out, or other causes, are backward and stagnant and therefore blighted and for which replanning and land assembly are deemed necessary as a condition of sound development.

*   *   *   *   *   *

"(r) 'Substandard housing conditions' means the conditions obtaining in connection with the existence of any dwelling, or dwellings, or housing accommodations for human beings, which because of lack of sanitary facilities, ventilation, or light, or because of dilapidation, overcrowding, faulty interior arrangement, or any combination of these factors, is in the opinion of the Commissioners detrimental to the safety, health, morals, or welfare of the inhabitants of the District of Columbia."

60 Stat. 793 (1946), D.C.Code § 5–703 (1951):

"(a) The District of Columbia Redevelopment Land Agency is hereby established and shall be composed of five members. * * *"

60 Stat. 793 (1946), D.C.Code § 5–704 (1951):

"(a) Subject to and in accordance with the procedures, conditions, and other provisions of sec-

tions 5–701 to 5–719, the Agency is hereby granted the power to further the redevelopment of blighted territory in the District of Columbia and the prevention, reduction, or elimination of blighting factors or causes of blight and for that purpose to acquire and assemble real property by purchase, exchange, gift, dedication, or eminent domain, and including the power to rent, maintain, manage, operate, repair, clear, transfer, lease, and sell such real property, but excluding the power to build new structures thereon (other than the improvements mentioned in section 5–706(i) or the power to enlarge, extend, or make major structural improvements of existing buildings).

"(b) Condemnation proceedings for the acquisition of real property for said purposes shall be conducted in accordance with the procedural provisions of sections 16–619 to 16–644. The title to properties acquired under sections 5–701 to 5–719 shall be taken by and in the name of the Agency and proceedings for condemnation or other acquisition of property shall be brought by and in the name of the Agency."

60 Stat. 794 (1946), D.C.Code § 5–705 (1951).

"(a) The Planning Commission is hereby directed to make and, from time to time, develop a comprehensive or general plan of the District of Columbia, including the appropriate maps, charts, tables, and descriptive, interpretative, and analytical matter, which plan is intended to serve as a general framework or guide of development within which the various project areas may be more precisely planned and calculated, and which comprehensive or general plan shall include at least a land-use plan which designates the proposed general distribution and general locations and extents of the uses of the land for housing, business, industry, recreation, education, public buildings, public reservations, and other general categories of public and private uses of the land.

"(b) For the exercise of the powers granted to the Agency by sections 5–701 to 5–719 for the acquisition and disposition of real property for the redevelopment of a project area, the following steps and plans shall be requisite, namely:

"(1) Adoption by the Planning Commission of the boundaries of the project area proposed by it, submission of such boundaries to the District Commissioners, and approval thereof by said Commissioners.

"(2) Adoption by the Planning Commission and submission to, and, after a public hearing thereon, approval by the District Commissioners, of the redevelopment plan of the project area which shall contain a site and use plan for the redevelopment of the area, including the approximate locations and extents of the land uses proposed for and within the area, such as public buildings, streets, and other public works and utilities, housing, recreation, business, industry, schools, public and private open spaces, and other categories of public and private uses. Such plan shall also contain specifications of standards of population density and building intensity. Any such plan may also specify, by means of specification of maximum rentals or other basis, the amount or character or class of any low-rent housing for which the area or part thereof is proposed to be redeveloped.

\* \* \* \* \* \*

"(d) After a project area redevelopment plan shall have been adopted by the Planning Commission and approved by the District Commissioners, the Planning Commission shall forthwith certify said plan to the Agency, whereupon said Agency shall proceed to the exercise of the powers granted to it in sec-

tions 5–701 to 5–719 for the acquisition and assembly of the real property of the area. \* \* \*"

60 Stat. 795 (1946), D.C.Code § 5–706 (1951):

"(a) After the real property in the project area shall have been assembled by the Agency, the Agency shall have the power to transfer to and shall at a practicable time or times transfer by deeds to the United States or to the District of Columbia, or to the appropriate Federal or District public body, department, or agency, those pieces of real property which, in accordance with the approved project area redevelopment plan, are to be devoted to public uses (other than public housing) falling within the construction or administrative jurisdiction of Federal or District agencies, such as streets and other utilities and works, Federal and District public buildings, public recreational spaces, and schools. \* \* \*

"(b) The Agency shall have the power to lease or sell the remainder of the project area as an entirety to a redevelopment company or to an individual or a partnership. \* \* \*

"(c) Any such lease or sale may be made without public bidding but only after a public hearing, after ten days' public notice, by the Agency upon the proposed lease or sale and the provisions thereof.

"(d) The term of any such lease shall be fixed by the Agency and the instrument of lease may provide for renewals upon reappraisals and with rentals and other provisions adjusted to such reappraisals. Every such lease or sale shall provide that the lessee or purchaser shall carry out or cause to be carried out the approved project area redevelopment plan or approved modifications thereof and that no use shall be made of any land or real property included in the lease or sale nor any building or structure erected thereon which does not conform to such approved plan or approved modifications thereof. \* \* \*

"(e) Until the Agency certifies that all building constructions and other physical improvements specified to be done and made by the purchaser of the area have been completed, the purchaser shall have no power to convey the area, or any part thereof, without the consent of the Agency; \* \* \*.

"(f) In lieu of the lease or sale of a project area as an entirety, the Agency shall have the power to lease or sell parts of such area separately to individuals, partnerships, or redevelopment companies. \* \* \*

\* \* \* \* \* \*

"(h) The Agency may itself demolish any existing structure or clear the area or any part thereof, or may specify the demolition and clearance to be performed by a lessee or purchaser within a reasonable time after such lease or purchase. The Agency may specify a reasonable time schedule and reasonable conditions for the construction of buildings and other improvements by a lessee or purchaser: \* \* \*."

60 Stat. 797 (1946), D.C.Code § 5–707 (1951):

"(a) Prior to approval by the District Commissioners, pursuant to subparagraph (2) of section 5–705 (b), of any redevelopment plan, the District Commissioners shall satisfy themselves (and shall so state at the public hearing required by such subparagraph) that decent, safe, and sanitary housing, substantially equal in quantity to the number of substandard dwelling units to be removed or demolished within the project area, under the proposed redevelopment plan, are available or will be provided (by construction pursuant to the redevelopment plan, or otherwise) in localities, and at rents or prices, within the reach of the low-income families displaced or to be displaced (temporarily or permanently), pursuant to the rede-

velopment plan, from the project area."

63 Stat. 441 (1949), D.C.Code § 5–717a (1951):

"*    *    *    *

"(g)   It is the purpose and intent of this section to authorize the District Commissioners and the appropriate agencies operating within the District of Columbia to do any and all things necessary to secure financial aid under title I of the Housing Act of 1949.   The District of Columbia Redevelopment Land Agency is hereby declared to be a local public agency for all of the purposes of title I of the Housing Act of 1949.  *  *  * "